BENEFICIAL LIFE INSURANCE COMPANY, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3266–80.    Filed October 4, 1982.

*Thomas G. Nash, Jr.,* and *Craig T. Vincent,* for the
petitioner.

*Seymour I. Sherman,* for the respondent.

FAY, *Judge*: Respondent determined deficiencies in petition-
er's Federal income tax as follows:

| Year | Deficiency |
|------|------------|
| 1972 | $1,224,303 |
| 1973 | 1,727,061 |
| 1974 | 1,871,501 |
| 1975 | 770,916 |
| 1976 | 1,326,677 |

After concessions, the issues remaining concern the proper tax
treatment to be accorded certain reinsurance transactions.
Those issues, delineated more fully *infra*, are (1) whether the
assuming or reinsuring company recognizes income to the
extent the reserve liabilities assumed exceed the initial

consideration received; (2) if so, whether such excess is currently deductible or represents the acquisition of an asset, the cost of which is amortizable over the useful life of that asset; and (3) what effect, if any, do adjustments made pursuant to section 818(c)[1] have upon the amounts included in income.

## FINDINGS OF FACT

Some facts have been stipulated and are found accordingly.

Petitioner Beneficial Life Insurance Co. had its principal place of business in Salt Lake City, Utah, when its petition herein was filed.

Beneficial Life Insurance Co. (hereinafter petitioner) is a Utah corporation which engages in the insurance business in numerous States. During the years in issue, petitioner's principal insurance risks consisted of life contingencies originally written by petitioner or written by other companies and reinsured by petitioner.

Life insurance policies are issued on the basis of "level" premiums—premiums determined at the original issue date which remain constant.[2] Each premium paid consists of two elements—the "net valuation" portion, which is an amount set by State law to be allocated to the policy reserve, and the "loading" portion, which is available for paying commissions and other expenses.

When a company issues a life insurance policy or a contract of reinsurance, State law requires the company to reflect a "reserve" liability. Such reserve must be maintained throughout the policy life. At any given time, the reserve amount is the excess of the then-present value of future benefits payable under the policy over the then-present value of future net premiums. Such liability, designated as the "reserve," must be backed by company-retained cash or other assets. The total of required reserves and incurred expenses frequently exceeds the total premiums received in the early policy years. Consequently, many life insurance companies, which are new or are

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended.

[2]The above finding is pursuant to the parties' stipulation in this case.

growing substantially, suffer a drain on surplus. If such drain goes unchecked, surplus could be so reduced that the company would be prevented from, or curtailed in, further underwriting activity.

In order to reduce early policy year surplus drain, a company may elect to calculate its required reserves under the "preliminary term" method rather than the "net level" method. Under the "net level" method, a new policy immediately contributes to reserves. Since first-year expenses, including commissions, are usually high, surplus often must be drawn upon. However, if the "preliminary term" method is elected, first-year reserves are lower, and annual reserve additions increase over the policy life. Both methods ultimately result in the same established reserve over the life expectancy of the insured.

A second method of combating surplus drain is for the issuing company to purchase reinsurance in order to shift all or part of the insurance risks to another insurance company. The company purchasing the reinsurance is known as the ceding company, and the company acquiring the risk is known as the assuming or reinsuring company. One significant effect of such an arrangement is that the ceding company may release reserves which, in turn, restores surplus. There exist many variations of reinsurance arrangements, three of which are relevant in this case. Those three, together with the specific facts of this case pertinent thereto, are discussed separately below.

### Assumption Reinsurance

In an assumption reinsurance arrangement, the assuming company takes over for the ceding company. The assuming company becomes directly liable to the policyholders, and the ceding company basically is relieved of liability, including the maintenance of applicable reserves. The assuming company is entitled to all premiums paid and must pay all future claims and expenses. Thus, the assuming company must maintain and carry the required policy reserves.

In December 1973, petitioner executed a three-party "Purchase Agreement" with American Pacific Life Insurance Co. (Pacific) and Somerset Life Insurance Co. (Somerset) with respect to certain life insurance policies originally written by

Pacific and previously reinsured by Somerset. The agreement was an assumption reinsurance transaction whereby petitioner took over for Pacific and Somerset as insurer, assumed all liability for claims under the subject policies, became entitled to future premiums, and issued assumption certificates to the policyholders.

The "Purchase Agreement" provided petitioner would "purchase" the policies reinsured by Somerset, and would pay Somerset a $225,000 "purchase price" for the policies. Somerset agreed to transfer to petitioner an amount equal to the required policy net reserves less the $225,000 "purchase price." Although various transfers of funds and credits were necessary to effect the transfer of the subject policies, the end result, as pertinent herein, was that petitioner received an initial cash consideration of $285,738—an amount equal to initial statutory reserves of $510,738 less the $225,000 "purchase price."[3] However, as a result of various subsequent adjustments, the "purchase price" was increased to $229,604.

In computing its 1973 Federal income tax, petitioner deducted the increase in reserves, and included in income the cash consideration received from Somerset. Such resulted in a $229,604 net reduction in gain from operations with respect to this transaction. In his statutory notice of deficiency, respondent determined the $229,604 was includable in petitioner's income as an amount Somerset paid petitioner, and the $229,604 also represented the "cost of acquiring insurance business" which is amortizable over the useful life of the business acquired.[4]

### Conventional Coinsurance

In a conventional coinsurance arrangement, the ceding company transfers to the reinsuring company all or part of its liability on the policies being reinsured. The ceding company reduces its reserves attributable to the transferred liability, and the reinsuring company sets up a reserve to cover the

---

[3]The statutory reserves of $541,155.23 plus advance premiums of $78.52 less net due and deferred premiums of $30,496.34 result in the $510,738 figure due petitioner from Somerset from which the purchase price was subtracted.

[4]The parties agree, if amortization is required, the useful life to be used is 15 years.

risks acquired. The ceding company remains directly liable to the policyholders, collects premiums, and pays claims and expenses. The reinsuring company receives an agreed reinsurance premium from the ceding company and must reimburse the ceding company for the portion of claims and expenses attributable to the risks reinsured.

During the years in issue, petitioner, as the reinsuring company, entered into five separate conventional coinsurance agreements with the following companies as ceding companies: United American Life Insurance Co. (United), American Western Life Insurance Co. (Western), Alexander Hamilton Life Insurance Co. of America (Hamilton), Continental Western Life Insurance Co. (Continental), and Occidental Life Insurance Co. of California (Occidental).[5] Each of those agreements transferred to petitioner the ultimate liability, by way of a duty to indemnify the ceding company, with respect to all or part of the benefits payable under certain life insurance policies which were the subjects of the respective agreements.[6]

Each of the agreements noted petitioner's agreement to indemnify the ceding company for payment of covered benefits and petitioner's corresponding duty to carry the applicable reserves and assets pertaining thereto. Such assumed duties of petitioner were noted as being "in consideration of the initial and renewal reinsurance premiums."[7] The "initial reinsu-

---

[5]The execution and effective dates of those conventional coinsurance agreements are as follows:

| Ceding company | Execution date | Effective date |
| --- | --- | --- |
| United | July 1974 | June 30, 1974 |
| Western | Dec. 1974 | June 30, 1974 |
| Hamilton | Dec. 1975 | Sept. 30, 1975 |
| Continental | Dec. 1975 | Dec. 31, 1975 |
| Occidental | Dec. 1975 | Dec. 31, 1975 |

[6]Policies which were the subjects of the various agreements were so identified. Not all benefits were covered—the agreement would either limit itself to defined "ordinary life benefits" or to a specific insurance plan. The United and Occidental agreements transferred 100 percent of the liability for covered benefits, the Western and Hamilton agreements transferred 50 percent, and the Continental agreements transferred 100 percent with respect to some policies and 28 percent with respect to others.

As noted, the Western agreement applied to 50 percent of the subject policies. The Hamilton agreement applied to the remaining 50 percent of the same policies. The policies originally were written by Western. In 1973, Hamilton reinsured 50 percent on a conventional coinsurance basis. The Hamilton agreement with petitioner in 1975 is petitioner's assumption of Hamilton's previous reinsurance arrangement with Western.

[7]The above-quoted language is taken from the United, Western, and Continental agreements. The Hamilton assumption agreement (see note 6 supra) contains similar language, while the Occidental agreement does not.

rance premium" due petitioner from the respective ceding companies was set forth in each agreement as follows:

UNITED: " * * * $1,244,439, subject to adjustment upon final identification of all Reinsured Policies."

WESTERN: " * * * $420,218.00 in cash and $961,673.00 by transfer of 100% of the outstanding policy loan balances secured by the Included Policies, subject to adjustment upon final identification of all Included Policies."

HAMILTON: " * * * the gross life insurance reserve (including the reserve for non-deduction of deferred fractional premiums, substandard extra reserve, and return of unearned premium reserve) less the net due and deferred premium, plus the liability for advanced premiums plus the dividend liability less Seventeen Dollars and Fifty Cents ($17.50) per One Thousand Dollars ($1,000) of insurance in force as of September 30, 1975."

CONTINENTAL: " * * * the net reserves on the Reinsured Policies, less an expense allowance of $19.33 per $1,000 of the face amount of the Reinsured Policies."

OCCIDENTAL: " * * * an amount equal to the statutory reserve as of the effective date of this Agreement for the life insurance reinsured hereunder, less $20.00 per each one thousand dollars of initial face amount reinsured."

In each of the agreements, the starting point was the ceding company's obligation to pay petitioner an amount equal to the applicable reserve liability petitioner assumed. In the United agreement, the $1,244,439 was calculated as net reserves of $1,614,653 less 80 percent of the "present value of future profits."[8] In the Western agreement, the $1,381,891 ($420,218 + $961,673) was calculated as net reserves of $1,775,531 minus a $393,640 "coinsurance allowance." In the Hamilton, Continental, and Occidental agreements, the initial consideration was expressed as reserves less a set amount.

The renewal reinsurance premiums due petitioner under the agreements were established as follows:

UNITED: " * * * the actual gross premiums collected by United as premiums due for Ordinary Life Benefits * * * "

WESTERN: " * * * 50% of the gross premiums * * * [9]"

HAMILTON: " * * * gross premium net of the endowment feature charged by American [Western] less commissions, premium taxes, and allowances * * * and less any dividends * * * [10]"

---

[8]Net reserves basically being reserves plus advance premiums minus net due and deferred premiums.

[9]"Gross premiums" under the Western agreement being defined as the actual premiums collected for ordinary life benefits minus a $12.50 per $1,000 face amount "endowment feature."

[10]The above-quoted language taken from the initial Hamilton-Western coinsurance agreement assumed by petitioner. See note 6 supra.

CONTINENTAL: " * * * collected premiums, excluding all premiums for riders but including substandard extra premiums."

OCCIDENTAL: " * * * the annual premium, excluding the applicable policy fee(s), * * * less an allowance of 7½% for each policy year reinsured."

While the agreements seem to give petitioner the right to all future premiums, in each case, the ceding company was entitled to retain part.[11]

The following chart represents the amounts and flows of moneys as pertinent herein.[12]

|  | United | Western | Hamilton | Continental | Occidental |
|---|---|---|---|---|---|
| Reserves[1] | $1,614,653 | $1,896,104 | $1,965,365 | $4,644,402 | $5,138,199 |
| Allowances[2] | 370,214 | 414,724 | 548,581 | 1,204,658 | 1,052,169 |
| Net to petitioner | 1,244,439 | 1,481,380 | 1,416,784 | 3,403,744 | 4,086,030 |

[1] Listed reserve amounts are net reserves and thus include advance premiums but not due and deferred premiums.

[2] The "allowance" figure was characterized differently in the various agreements. In the United agreement, it was subtracted as being 80 percent of the "present value of future profits." In the Western transaction, it was denominated a "coinsurance allowance." In the Hamilton, Continental, and Occidental agreements, it was a subtraction from reserves.

On its Federal income tax return for the applicable year, petitioner deducted the increase in reserves and included in income the actual consideration received, the amount denoted "net to petitioner" above.

In his statutory notice of deficiency, respondent determined the "allowance" amount was also income to petitioner. Additionally, respondent determined such amount represented the cost of an acquired asset, a block of business, which is amortizable over the asset's useful life. See note 4 *supra*.

### Modified Coinsurance

A modified coinsurance arrangement differs from a conventional coinsurance arrangement in that the ceding company retains the assets attributable to the transaction, continues to carry the reserves on its books, and collects any investment income derived from the assets supporting the reserves.

---

[11] In some cases, i.e., Occidental, such was done expressly. In others, via a quarterly accounting procedure, the net amount due either petitioner or the ceding company was calculated. Within that calculation was a varying percentage of premiums allowance in favor of the ceding company.

[12] The listed amounts reflect any post-agreement adjustments.

However, if the parties consent to the treatment provided by section 820, the ceding company's retention of assets and corresponding reflection of reserves are treated as being custodial—for the reinsuring company's behalf. Thus, for Federal tax purposes, the same shift of reserves from the ceding to the reinsuring company takes place.[13]

During the years in issue, petitioner, as the reinsuring company, entered two modified coinsurance arrangements with United and Continental, respectively, as the ceding companies.[14] In both transactions, petitioner accepted the duty to indemnify the ceding company for "ordinary life benefits" with respect to the covered percentage of the subject policies.[15] While, in accordance with the nature of a modified coinsurance arrangement, the assets and reserves actually remained with the ceding companies, section 820 consents were filed so such retention is treated as being custodial for petitioner.

The actual agreements between the parties (1) provided for petitioner's ultimate liability for the covered percentage of "ordinary life benefits," (2) charged petitioner, on an annual basis, with any increase in net policy reserves, (3) credited petitioner, on an annual basis, with any decrease in net policy reserves, and (4) entitled petitioner to the applicable gross premiums.[16]

Both agreements provided for an "initial reinsurance premium" payable to petitioner from the ceding company— $1,460,362 in the United agreement and $8,495,211 in the Continental agreement. The United $1,460,362 was equal to net reserves of $2,567,959 minus $1,107,597 representing 80

---

[13]Furthermore, certain investment income is deemed to be that of the reinsuring company for Federal tax purposes.

[14]The United agreement was executed in July 1974, but effective as of June 30, 1974. The Continental agreement was executed in December 1975 to be effective Dec. 31, 1975.

[15]Subject policies were identified. The United agreement covered 100 percent of the ordinary life benefits liability, while the Continental agreement covered 72 percent. "Ordinary life benefits" were defined slightly differently. In both agreements, basic death benefits and cash surrender benefits were covered. In the Continental agreement, endowment benefits were covered as well.

[16]Petitioner was not made liable for agents' commissions and premium taxes; however, the ceding company was given an expense allowance to be credited against any amount due petitioner. The above calculations were taken into account in quarterly settlements wherein amounts due each party from the other were netted so that only the party owing more actually paid the net due amount.

percent of the "present value of future profits." The Continental $8,495,211 was equal to net reserves minus an "expense allowance" of $19.33 per $1,000 face amount. Later adjustments resulted in an $8,752,488 payment to petitioner—net reserves of $11,942,750 minus a $3,190,262 "expense allowance."

On its applicable Federal income tax returns, petitioner deducted the increases in reserves and included the payments received ($1,460,362 (United) and $8,752,488 (Continental)) in income. In his statutory notice of deficiency, respondent determined the excess of reserves over payment received was income to petitioner, but was also the cost of an acquired asset, in the form of a block of business, which is amortizable over the asset's useful life. See note 4 *supra*.

### Reserve Calculations

In 1969, petitioner elected to revalue its life insurance reserves in accordance with section 818(c), using the approximate valuation method. In 1973, 1974, and 1975, in accordance with such election, petitioner revalued, at the beginning and end of each respective year, the reserves on policies of life insurance in force at such dates with petitioner. Reserves attributable to policies reinsured or acquired by petitioner during the year were revalued and reflected solely as of the end of the year. The yearend increases to petitioner's reserves attributable to such revaluations of policies reinsured or acquired were as follows:

| Year | Amount |
|------|--------|
| 1973 | $94,919 |
| 1974 | 2,180,857 |
| 1975 | 6,066,333 |

As a result of petitioner's section 818(c) election, petitioner's additional section 818(c) reserves attributable to the reinsurance contracts in controversy herein were as follows:

| Year | Ceding company | Amount |
|------|---------------|--------|
| 1973 | Pacific | $94,919 |
| 1974 | Pacific | (24,839) |
| | United | 1,434,512 |
| | Western | 745,345 |

| 1975 | Pacific | ($9,342) |
|---|---|---|
| | United | (221,663) |
| | Western | (117,518) |
| | Hamilton | 617,237 |
| | Continental | 1,237,137 |
| | Continental (modified) | 3,215,083 |
| | Occidental | 996,876 |
| 1976 | Pacific | (6,718) |
| | United | (98,265) |
| | Western | (156,549) |
| | Continental | (166,056) |
| | Continental (modified) | (429,157) |
| | Occidental | (82,346) |

The reinsured policies had been in force for varying lengths of time before the transactions with petitioner, and most had been in force before the beginning of the year in which they were a subject of a reinsurance transaction with petitioner. In his statutory notice of deficiency, respondent determined that increases to reserves resulting from the foregoing recomputations must be reflected in income.

## OPINION

The issues before us concern the proper tax treatment to be afforded certain reinsurance transactions. Although similar in many ways, the analysis concerning assumption reinsurance differs somewhat from the analysis concerning conventional or modified coinsurance. Thus, we shall discuss them separately.

### Assumption Reinsurance

Assumption reinsurance is a transaction whereby one insurance company (the ceding company) transfers certain of its policies to another insurance company (the assuming company). The assuming company steps into the ceding company's shoes—it assumes the statutory reserve liability on the policies; it gains entitlement to all future premiums; and, it becomes directly liable to the policyholders. See sec. 1.809-5(a)(7)(ii), Income Tax Regs. The ceding company is relieved of liability and, thus, reduces its required reserves.

In 1973, petitioner, as the assuming company, entered an assumption reinsurance transaction with American Pacific

Life Insurance Co. and Somerset Life Insurance Co. with respect to policies originally written by Pacific and previously reinsured by Somerset. The "Purchase Agreement" executed by the parties provided petitioner would pay Somerset a $225,000 purchase price for the transferred policies, while Somerset agreed to transfer to petitioner an amount equal to the required net reserves less the "purchase price." The end result was a cash payment to petitioner of $285,738—net reserves of $510,738 less the $225,000 "purchase price." As a result of various subsequent adjustments, the "purchase price" was increased to $229,604. The issues presented with respect to this assumption reinsurance transaction concern the treatment of the $229,604 "purchase price" amount.

Petitioner contends it is entitled to deduct in full the increase in reserves required as a result of its assumption of the subject policies, and respondent does not disagree. See sec. 809(d)(2). Petitioner also maintains it must include in income only the amount actually received from the ceding company—the net reserves minus the "purchase price." It is that contention respondent disputes.

Respondent, relying on section 1.817–4(d)(2)(iii), Income Tax Regs., maintains that the amount by which required reserves exceed the actual cash consideration received by petitioner represents additional consideration received by petitioner for assuming the liabilities with respect to the subject policies. In effect, respondent reasons the full reserve amount was paid to petitioner for assuming the full reserve liability, and then petitioner paid $229,604 (the excess amount in issue) for acquisition of the subject policies.[17] We agree with respondent.

Life insurance companies are taxed on their "life insurance company taxable income" which is defined as the sum of taxable investment income (or gain from operations if less) plus an amount equal to 50 percent of any excess of gains from operations over taxable investment income plus any amount subtracted from the policyholders' surplus account for the taxable year. See sec. 802. In this case, we are concerned with the "gain from operations" component of that computation.

Broadly paraphrased, "gain from operations" is defined in

---

[17]As to the amount of the "full reserve liability," see discussion of the sec. 818(c) issue *infra.*

section 809(b)(1) as being the amount by which the sum of the company's share of investment yield plus net capital gain plus specified items exceeds specified deductions.[18] The added specified items are delineated in section 809(c) and include:

(1) PREMIUMS.—The gross amount of premiums and other consideration (including advance premiums, deposits, fees, assessments, and consideration in respect of assuming liabilities under contracts not issued by the taxpayer) on insurance and annuity contracts (including contracts supplementary thereto); less return premiums, and premiums and other consideration arising out of reinsurance ceded. Except in the case of amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded, amounts returned where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management shall not be included in return premiums.

Thus, consideration received in respect of assuming liabilities under contracts issued by another is included. We cannot accept petitioner's argument that such "consideration" only includes the cash payment actually received from Somerset.

Petitioner assumed a liability of $510,738 and received a block of insurance business. Somerset was relieved of that $510,738 liability and gave up a block of insurance business. As the agreement was structured, Somerset owed petitioner an amount equal to the liability petitioner assumed but only had to pay petitioner that amount to the extent it exceeded what petitioner owed Somerset for the insurance business petitioner acquired. In essence, Somerset received a credit for the amount petitioner owed Somerset. The amount of that credit must be treated as consideration passing to petitioner. See *Tyrer v. Commissioner*, 77 T.C. 577 (1981).

Such a result comports with section 1.817–4(d)(2)(iii), Income Tax Regs., which provides, in an assumption reinsurance transaction, that:

where the reinsured [ceding company] transfers to the reinsurer [assuming company] * * * a net amount which is less than the increase in the reinsurer's reserves resulting from the transaction, the reinsurer shall be treated as—

(A) Having received from the reinsured consideration in an amount equal to the net amount of the increase in the reinsurer's reserves resulting from the transaction, and

---

[18]If specified deductions exceed the sum of the company's share of investment yield plus net capital gain plus specified items, a "loss from operations" obtains. See sec. 809(b)(2).

(B) Having paid the reinsured an amount for the purchase of the contracts equal to the excess of the amount of such increase in the reinsurer's reserves over the net amount received from the reinsured.

In essence, the above-quoted regulation treats an assumption reinsurance transaction as two separate exchanges. In one exchange, the assuming company receives as consideration (and thus income) for assuming the applicable reserve liability amounts equal to that reserve liability. In the second exchange, the assuming company pays the ceding company an amount equal to the value of the contracts purchased by the assuming company. We view such a characterization as entirely reasonable. In fact, it is essentially equivalent to this Court's rationale in *Kentucky Central Life Insurance Co. v. Commissioner*, 57 T.C. 482 (1972).

In *Kentucky Central*, one insurance company purchased a division of another insurance company through an assumption reinsurance transaction. The assets, totaling $1,800,000, to be received by the assuming company were valued as follows:

Real estate ........................ $145,000
Office equipment ................ 5,000
Insurance business .............. 1,650,000

The amount equal to the applicable reserve liability which the assuming company agreed to assume was to be credited against the $1,800,000 purchase price owed to the ceding company for the transferred assets. In actuality, the applicable reserve amount exceeded the $1,800,000 purchase price, and the ceding company paid such amount to the assuming company.

The assuming company included in income only the $150,000 value of the tangible assets and the actual cash payment received from the ceding company and deducted, in full, the reserve liability assumed. Respondent contended the value of the transferred policies received also constituted income to petitioner, and we agreed. In so doing, we made the following analysis:

Had the transaction been handled without the use of credits, on a strictly cash basis, it is assumed that taxpayer [the assuming company] would have paid Guaranty [the ceding company] $1,800,000 cash in return for not only the tangible assets and insurance contracts purchased, but also the required reserves previously accumulated from premiums on the policies. Obviously, Kentucky Central [the assuming company] would not have been willing to

pay $1,800,000 for the * * * business and also to transfer $1,960,398.11 [the applicable reserve amount] from its surplus account to set up reserves for those policies. This would, in effect, amount to a payment of $3,760,398.11 in exchange for insurance business assets worth approximately $1,800,000.

As the sale worked out, taxpayer [the assuming company] succeeded in making the purchase of the * * * business without having to transfer any sizable amounts of cash or other assets as consideration for its new acquisitions. * * * Should petitioner's argument prevail, we would, in effect, be allowing it a current loss deduction for $1,650,000 of the purchase price it indirectly paid Guaranty. Such could not have been the intendment of section 809 when enacted by Congress. [57 T.C. at 497.]

We are convinced our analysis in *Kentucky Central* was sound, and section 1.817–4(d)(2)(iii), Income Tax Regs., provides the proper treatment of credits between the parties in an assumption reinsurance transaction.

We are aware of the cases disagreeing with our position. In *Mutual Savings Life Insurance Co. v. Commissioner*, 488 F.2d 1142 (5th Cir. 1974), the Court of Appeals for the Fifth Circuit held the assuming company did not recognize income to the extent the reserves it assumed (and thus deducted) exceeded the actual cash consideration received from the ceding company. However, the sole basis for such holding was that court's decision that the taxpayer therein was entitled to rely upon a regulation then in force. Petitioner maintains a similar result is mandated herein under the same regulation.

Section 1.817–4(d)(2), Income Tax Regs., as in effect prior to its amendment in 1976, did not include any specific textual reference to the assuming company having income equal to the excess of the amount of reserve liability assumed over the actual cash consideration received.[19] A then-existing example provided as follows:

*Example (1).* On June 30, 1959, X, a life insurance company, reinsured a portion of its insurance contracts with Y, a life insurance company, under an agreement whereby Y agreed to assume and become solely liable under the contracts reinsured. The reserves on the contracts reinsured by X were $100,000. Under the reinsurance agreement, X agreed to pay Y a consideration of $75,000 in cash for assuming such contracts. Assuming no other insurance transactions by X or Y during the taxable year, and assuming that X and Y compute the reserves on the contracts reinsured on the same basis, X has income of $100,000 under section 809(c)(2) as a result of this net decrease in its reserves and a deduction of $75,000 under section 809(d)(7) for

---

[19]Compare current sec. 1.817–4(d)(2)(iii), Income Tax Regs., quoted on pages 638–639 *supra.*

the amount of the consideration paid to Y for assuming these contracts. Y has income of $75,000 under section 809(c)(1) as a result of the consideration received from X and a deduction of $100,000 under section 809(d)(2) for the net increase in its reserves.

The court in *Mutual Savings* read that example as giving "no recognition to the intangible value of policies transferred" and found the taxpayer therein had a "right to rely upon the Government's Regulations and their published illustrations." 488 F.2d at 1145. In *Kentucky Central,* we found the same regulation to be nondispositive. See 57 T.C. at 499–500.

Regardless of the weight and interpretation to be given the above-quoted example, it is inapplicable herein. Section 1.817–4(d), Income Tax Regs., was amended in 1976 to add the language now found at section 1.817–4(d)(2)(iii), quoted at pages 638–639 *supra,* and to add a new example (*1*) in section 1.817–4(d)(3) which reads as follows:

*Example (1).* On June 30, 1959, X, a life insurance company, reinsured a portion of its insurance contracts with Y, a life insurance company, under an agreement whereby Y agreed to assume and to become solely liable under the contracts reinsured. The reserves on the contracts reinsured by X were $100,000. Under the reinsurance agreement X agreed to pay Y $100,000 for assuming such contracts and Y agreed to pay X $17,000 for the right to receive future premium payments under this block of contracts. Rather than exchange payments of money, X agreed to pay Y a net amount of $83,000 in cash. Assuming that the reasonably estimated life of the contracts reinsured is 17 years, that there are no other insurance transactions by X or Y during the taxable year, and assuming that X and Y compute the reserves on the contracts reinsured on the same basis, X has income of $100,000 under section 809(c)(2) as a result of the net decrease in its reserves. X has a net deduction of $83,000 ($100,000 – $17,000) under section 809(d)(7). For the taxable year 1959, Y has income of $100,000 under section 809(c)(1) as a result of the consideration received from X and a deduction of $100,000 under section 809(d)(2) for the net increase in reserves and $1,000 ($17,000 divided by 17, the reasonably estimated life of the contracts reinsured), under section 809(d)(12). The remaining $16,000 shall be amortized over the next 16 succeeding taxable years (16 × $1,000 = $16,000) under section 809(d)(12) at the rate of $1,000 for each such taxable year.

Petitioner recognizes current section 1.817–4(d)(2) supports respondent's position and does not contend such regulation is invalid.[20] What petitioner does maintain is that the 1976 amendments to that regulation may not be applied retroac-

---

[20]In *Security Ben. Life Ins. Co. v. United States,* 517 F. Supp. 740 (D. Kan. 1980), appeal

tively to the assumption reinsurance transaction at issue herein which was consummated in 1973. We disagree.

It is undisputed respondent has broad authority concerning the retroactive effect of promulgated regulations. See sec. 7805(b); see also *Automobile Club of Mich. v. Commissioner*, 353 U.S. 180 (1957). An exception to such authority exists if such retroactive effect amounts to an abuse of discretion. However, such cases are rare and usually occur when retroactivity would produce an unduly harsh result in a particular case. See generally *Anderson, Clayton & Co. v. United States*, 562 F.2d 972 (5th Cir. 1977). As one commentator noted:

this doctrine of abuse of discretion has been invoked only in the few cases where the court found the reliance justifiable and the detriment very severe. [Comments, "Limits on Retroactive Decision Making by the Internal Revenue Service: Redefining Abuse of Discretion Under Section 7805(b)," 23 UCLA L. Rev. 529, 534 (1976). Fn. ref. omitted.]

Even if reliance would be a defense (see *Automobile Club of Mich. v. Commissioner, supra*), we are unable to find petitioner justifiably could have relied on old example (*1*) as settled law in 1973. First, old example (*1*) was inconsistent with its companion example (*2*) which clearly supports respondent's position herein.[21] Second, this Court's decision in *Kentucky Central*, issued on January 11, 1972, cast serious doubt on the breadth to be given old example (*1*). We simply are unconvinced that we are presented herein with a case in which retroactive application constitutes an abuse. Accord *Security Ben. Life Ins. Co. v. United States*, 517 F. Supp. 740 (D. Kan. 1980), appeal filed (10th Cir., Sept. 22, 1981).

We have found petitioner received "consideration" within the meaning of section 809(c)(1) equal to the full reserve liability assumed. See note 17 *supra*. However, we have also found such amount was paid for the acquisition of the insurance business acquired. The parties agree such "purchase price" amount must be amortized over the useful life of the

---

filed (10th Cir., Sept. 22, 1981), the U.S. District Court for the District of Kansas found the 1976 amendments to sec. 1.817–4(d), Income Tax Regs., to be invalid as applied to the case before the Court. We respectfully disagree.

[21]Sec. 1.817–4(d)(3), example (*2*), Income Tax Regs., prior to the 1976 amendments thereto, addressed the situation where an amount equal to assumed reserve liability actually was paid the assuming company which then paid the ceding company a cash bonus for the acquired contracts. That example reached a result consistent with the current regulations.

acquired business. Accord sec. 1.817–4(d)(2)(ii)(B), Income Tax Regs.; *Kentucky Central Life Insurance Co. v. Commissioner*, 57 T.C. 482 (1972). The parties have stipulated the applicable useful life to be 15 years.

## Conventional and Modified Coinsurance

In a conventional coinsurance arrangement, the ceding company transfers to the reinsuring company all or part of its liability on the policies being reinsured. The ceding company reduces its reserves attributable to the transferred liability, and the reinsuring company sets up a reserve to cover the risks acquired. The ceding company remains directly liable to the policyholders, collects premiums, and pays claims and expenses. The reinsuring company receives an agreed reinsurance premium from the ceding company and must reimburse the ceding company for the portion of claims and expenses attributable to the risks reinsured.

A modified coinsurance arrangement differs from a conventional coinsurance arrangement in that the ceding company retains the assets attributable to the transaction, continues to carry the reserves on its books, and collects any investment income derived from assets supporting the reserves. However, if the parties consent to the treatment provided by section 820, the ceding company's retention of assets and corresponding reflection of reserves are treated as being custodial—for the reinsuring company's behalf. Thus, for Federal tax purposes, the same shift of reserves from the ceding to the reinsuring company takes place, and the same result will obtain with respect to the issues herein. For convenience, we shall hereinafter refer to conventional and modified coinsurance collectively as indemnity reinsurance.

During the years in issue, petitioner, as the reinsuring company, entered into seven indemnity reinsurance agreements—five conventional coinsurance agreements and two modified coinsurance agreements. The details of those agreements are set forth in our findings of fact at pages 630–634 and 633–634, respectively. In each of those transactions, petitioner agreed to indemnify the ceding company for payment of covered benefits and agreed to carry the applicable reserves. In return, petitioner became entitled to both an initial

reinsurance premium and renewal reinsurance premiums from the ceding company.

In each case, the starting point in the calculation of the amount due petitioner from the ceding company was the amount of the applicable reserves. See page 631 *supra*. Then, a second amount was subtracted from that reserve amount to arrive at the amount due petitioner from the ceding company. For example, in the transaction with United American Life Insurance Co., the amount due petitioner from United was calculated as follows:

| | |
|---|---|
| Net reserves .......................... | $1,614,653 |
| 80% of present value of future profits ...................... | 370,214 |
| Amount due petitioner ........... | 1,244,439 |

Thus, in the United transaction, as in each of the transactions at issue herein, petitioner assumed a reserve liability but received actual cash consideration from the ceding company in an amount less than the assumed liability. It is the excess amount—the amount by which the assumed reserves exceeded the actual payment received—which is at issue herein.

Petitioner contends it is entitled to deduct in full the increase in reserves required as a result of its assumptions of liability, and respondent does not disagree. See sec. 809(d)(2). Petitioner also maintains it must include in income *only* the amount actually received from the ceding company. It is with that contention respondent disagrees.

Respondent maintains the amount by which required reserves exceeded the actual cash consideration received by petitioner represents additional consideration received by petitioner for assuming liabilities with respect to the subject policies. As in the assumption reinsurance setting, respondent, in effect, reasons the full reserve amount was paid to petitioner for assuming the full reserve liability, and then, petitioner paid the ceding company an amount for petitioner's acquisition of future benefits.

Again our starting point is section 809(b)(1) "gain from operations" and the inclusion therein of premiums and "other consideration" under section 809(c)(1). As noted *supra* with respect to assumption reinsurance, "other consideration" includes consideration received in respect of assuming liabili-

ties under contracts not issued by the taxpayer. In indemnity reinsurance, as in assumption reinsurance, the reinsuring company does assume liabilities under contracts not issued by the reinsuring company. Thus, petitioner, as a reinsuring company, initially must include any consideration it received from the respective ceding companies.

We are unable to find the consideration received does not equal in full the amount of the reserve liability assumed. In each of the subject agreements, the reserve liability amount was the starting point for calculating the amount due petitioner from the ceding company. Then, the ceding company was, in effect, given a credit against that amount due so as to reduce the actual amount paid. However, that does not change the fact that, in reality, petitioner initially was entitled to an amount equal in full to the reserve liability assumed. See *Tyrer v. Commissioner*, 77 T.C. 577 (1981). To that extent, our analysis in *Kentucky Central* applies to indemnity reinsurance as well as to assumption reinsurance. However, the end result of such treatment differs.

As in assumption reinsurance, in reality, two exchanges take place: (1) The ceding company pays the reinsuring company full consideration for assuming the reserve liability, and (2) the reinsuring company pays the ceding company an allowance for the business acquired. It is upon the treatment of the second step that the tax consequences of assumption reinsurance and indemnity reinsurance diverge.

The reason for the divergence simply is that the Code, itself, affords an entirely different analysis. Basically, an assumption reinsurance transaction is treated as a sale by the ceding company to the reinsuring company. Thus, the reinsuring company must amortize the cost of the business acquired over that business' useful life (sec. 1.817–4(d)(2)(ii)(B), Income Tax Regs.),[22] and the ceding company may deduct any consideration paid the reinsuring company for assuming liabilities. See sec. 809(d)(7) and sec. 1.809–5(a)(7), Income Tax Regs.[23]

---

[22]The placement of the regulations concerning assumption reinsurance under sec. 817, which deals with capital gains and losses, derives from the 1958 treatment of assumption reinsurance transactions as sales of capital assets. See sec. 1.817–4(c), Income Tax Regs., and former sec. 817(e).

[23]In effect, as far as reserve liabilities are concerned, a wash occurs. The reinsuring

However, an indemnity reinsurance transaction is not treated as a sale.[24] Rather, it is treated as the ceding company's purchase of insurance from the reinsuring company. While we are unable to find such distinction makes a difference in determining that the reinsuring company receives consideration equal to the reserves assumed, it does make a difference in the treatment of the amount the reinsuring company pays the ceding company.

Section 809(c)(1) includes in the reinsurance income the consideration received with respect to assuming another's contract liabilities; however, it subtracts from that amount "return premiums, and premiums and other consideration arising out of reinsurance ceded." Section 1.809–4(a)(1)(ii), Income Tax Regs., defines "return premiums" as follows:

(ii) The term "return premiums" means amounts returned or credited which are fixed by contract and do not depend on the experience of the company or the discretion of the management. Thus, such term includes amounts refunded due to policy cancellations or erroneously computed premiums. *Furthermore, amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded shall be included in return premiums* * * * [Emphasis supplied.] [25]

Thus, the reinsuring company may subtract from income any "consideration returned" to the ceding company with respect to the reinsurance ceded. See S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 770, 809. Thus, the amounts petitioner "returned" to the respective ceding companies may be subtracted from the consideration received from the ceding company. Such results, of course, in only the actual cash consideration received from the ceding companies being part of petitioner's section 809(c)(1) income. However, we believe our analysis to be a more complete route to that end.

We realize that it may seem strange at first for the assumption reinsurance transaction and the indemnity reinsu-

company receives consideration (income) equal to the reserve liability assumed, but is entitled to a sec. 809(d)(2) deduction in an equal amount. But see sec. 818(c). For the treatment of the ceding company, see sec. 1.817–4(d)(2)(i), Income Tax Regs. See also sec. 806(a).

[24]See, e.g., sec. 809(d)(7), sec. 1.809–5(a)(7), Income Tax Regs., and sec. 1.817–4(d), Income Tax Regs., all of which apply only to assumption reinsurance transactions.

[25]For purposes of sec. 809(c)(1), "reinsurance ceded" includes indemnity insurance arrangements, but does not include assumption reinsurance arrangements. Sec. 1.809–4(a)(1)(iii), Income Tax Regs.

rance transactions at issue herein to have such different tax consequences when they are, at heart, so similar. An understanding of that difference must flow from the understanding of the complex and somewhat unique rules applicable to the insurance industry. Stated very basically, those rules are as follows:

As premiums on policies are received by a life insurance company, state insurance laws require a portion of the premiums to be set aside as reserves for the payment of claims. Premium receipts must be reported as income, but to avoid taxing the company on that portion of the premium receipts allocated to reserve requirements, the Act [the Life Insurance Company Income Tax Act of 1959] provides that amounts by which reserves are increased may be deducted from current operating income. Concomitantly, when a policy is paid on the death of the insured so that reserves are decreased and the reserved assets are freed for the company's general use, the amount of decrease must be reported as income for tax purposes. [*Mutual Savings Life Insurance Co. v. United States*, 488 F.2d 1142, 1143–1144 (5th Cir. 1974).]

Thus, reserves are deducted when set up and when added to; premiums are income as received;[26] and, decreases in reserves give rise to income. Additionally, an insurance company may deduct currently expenses such as commissions, taxes, and underwriting expenses. It is within that framework that indemnity reinsurance, as the reinsurer's sale of insurance, falls. In essence, the allowance paid the ceding company is analogous to currently deductible underwriting expenses.

Respondent cites to us numerous cases which require capitalization and amortization of acquisition expenses. However, such cases apply when an asset is acquired, not when insurance is sold. Although a reinsuring company does acquire an asset in a broad sense in the form of potential future profit, such is also true when an insurance company issues a single policy to an individual. Yet, the expenses relating to that policy are currently deductible. While respondent's argument is appealing, it does not comport with how life insurance companies are taxed with respect to insurance they issue. In essence, respondent argues indemnity reinsurance should be taxed as is assumption reinsurance; yet, the Code treats one as

---

[26]See *Commissioner v. Standard Life & Acc. Ins. Co.*, 433 U.S. 148 (1977), with respect to the treatment of unpaid premiums.

the issuance of insurance and one as acquisition of an asset. That makes all the difference.

*Section 818(c) Election*

The only issue remaining for decision is whether petitioner must include in income and assets an amount equal to the increased reserve deduction gained by petitioner via its section 818(c) election. An understanding of that issue requires a brief overview of the history and the general effect of a section 818(c) election.

As noted in our findings of fact, premiums paid on life insurance policies consist of two elements—the "net valuation" portion and the "loading portion." The "net valuation" portion is an amount set by State law as being the part of the premium which must be reflected in reserves. The "loading" portion is simply the remainder of the premium and is available for paying expenses.

Life insurance companies use two methods to calculate reserves—the "net level" method and the "preliminary term" method. The "net level" method assumes a uniform net valuation portion of premiums throughout the policy life. In other words, a uniform or level amount is added to reserves each year. On the other hand, the "preliminary term" method assumes a smaller net valuation portion which must be added to reserves in the first year with a larger net valuation portion assumed in later years. Thus, the first-year addition to reserves is smaller under the "preliminary term" method than under the "net level" method, but subsequent years' additions are greater than under the "net level" method.

Since State law requires reserves to be backed by company-retained cash or other assets, the larger the required reserve, the smaller the available surplus. Thus, electing the "preliminary term" method will result in less surplus drain in the first policy year when expenses are high. However, since additions to reserves basically are deductible, the "net level" method would result in a lower income tax liability.

Section 818(c) was enacted to remove any disparity in income tax treatment dependent upon which reserve calculation method is used. It provides as follows:

SEC. 818(c). LIFE INSURANCE RESERVES COMPUTED ON PRELIMINARY TERM BASIS.—For purposes of this part (other than section 801), at the election of

the taxpayer the amount taken into account as life insurance reserves with respect to contracts for which such reserves are computed on a preliminary term basis may be determined on either of the following bases:

(1) EXACT REVALUATION.—As if the reserves for all such contracts had been computed on a net level premium basis (using the same mortality assumptions and interest rates for both the preliminary term basis and the net level premium basis).

(2) APPROXIMATE REVALUATION.—The amount computed without regard to this subsection—

(A) increased by $21 per $1,000 of insurance in force (other than term insurance) under such contracts less 2.1 percent of reserves under such contracts, and

(B) increased by $5 per $1,000 of term insurance in force under such contracts which at the time of issuance cover a period of more than 15 years, less 0.5 percent of reserves under such contracts.

If the taxpayer makes an election under either paragraph (1) or (2) for any taxable year, the basis adopted shall be adhered to in making the computations under this part (other than section 801) for the taxable year * * * unless a change in the basis of computing such reserves is approved by the Secretary, * * *

Thus, in essence, section 818(c) permits a taxpayer-life insurance company using the "preliminary term" method to recalculate its reserves on a "net level" method for Federal tax purposes.

In 1969, petitioner elected to revalue its life insurance reserves in accordance with section 818(c), using the approximate valuation method. See sec. 818(c)(2). The effect of such an election is illustrated in respondent's brief as follows:

assume that * * * petitioner accepts reinsurance of $10 million face amount ("in force") of ordinary life benefits, on policies written between 1968 and 1972, on which the "book" reserves, (as computed under a preliminary term method) are in the amount of $1 million. The adjustment (increase) in reserves reached by mechanical application of the formula of I.R.C. §818(c)(2)(A) is $21 times 10,000 ($21 per thousand in force) less $21,000 (2.1 percent of $1 million), which equals $189,000.

Thus, an election pursuant to section 818(c) permits a larger increase in reserves in the first year for tax purposes than is required for State law purposes.

In 1973, 1974, and 1975, petitioner, in accordance with its section 818(c) election, revalued its reserves on policies of life insurance in force at the beginning and at the end of each respective year. Reserves attributable to policies reinsured or acquired by petitioner during the year were revalued and reflected solely as of year's end.

Respondent does not dispute that the section 818(c) election applies to an electing company which acquires business through reinsurance. However, respondent maintains petitioner must recognize income to the extent the section 818(c) election causes increases to reserves for Federal tax purposes greater than the increases to reserves for book purposes. In essence, respondent contends the section 809(c)(1) income petitioner must recognize as consideration for assuming the applicable reserves must be deemed to be equal to the reserves as revalued for tax purposes pursuant to section 818(c) rather than the actual required reserve liabilities assumed. We disagree.

There is simply no authority for respondent's position. First, our holding, *supra*, that petitioner must recognize section 809(c)(1) income equal in amount to the assumed liability is based on the economic realities of an arm's-length exchange. That is what petitioner logically would be compensated in full for the reserve liability actually assumed. Such logic cannot carry over to recalculations made solely for tax purposes. Second, section 818(c), itself, places no condition of income inclusion on its availability. Respondent points to the flush language of section 818(c) which provides, in part, that "the basis adopted shall be adhered to in making the computations under this part (other than section 801) for the taxable year and all subsequent taxable years" as requiring the reserves as revalued under section 818(c) to be the same reserve amount used in calculating income under section 809(c)(1). Such misreads the statute. All the flush language in section 818(c) does is make the section 818(c) and the accompanying method of election a continuing one. As the U.S. Court of Claims noted in *Reserve Life Ins. Co. v. United States*, 226 Ct. Cl. 169, 640 F.2d 368, 377 (1981):

The government contends that the word "basis" in this provision means the amount of the reserves as recalculated under a net level premium method and that the provision therefore requires that this amount of reserves "be adhered to" in making the "computations" of the company's assets and gross premium income in determining its federal tax liability.

Both the language and the legislative history of this provision, however, show that Congress used the word "basis" not in the usual tax sense of the cost of property. Rather, it means the method of recomputation utilized and not the amount of reserves that the recomputation produced. * * *

Thus, there is no requirement in section 818(c) that reserves as

recalculated must be used for all purposes. Accord *Reserve Life Ins. Co. v. United States, supra; Security Ben. Life Ins. Co. v. United States,* 517 F. Supp. 740 (D. Kan. 1980), appeal filed (10th Cir., Sept. 22, 1981).

## Summary

We realize the foregoing represents a long venture into the complexities of life insurance company taxation which may leave a reader unfamiliar with the area puzzled. Thus, we summarize our findings below.

With respect to an assumption reinsurance transaction, the assuming company must include in income an amount equal to the reserve liability actually assumed. Such amount is not affected by any revaluation of reserves made pursuant to a section 818(c) election. To the extent the assumed reserve liability exceeds the actual consideration received from the ceding company, such excess represents the assuming company's cost of business acquired which is amortizable over the useful life of that business.

With respect to indemnity reinsurance, the reinsuring company must include in income an amount equal to the reserve liability actually assumed. Such amount is not affected by any revaluation of reserves made pursuant to a section 818(c) election. To the extent the assumed reserve liability exceeds the actual consideration received from the ceding company, such excess represents the reinsuring company's cost of issuing insurance which may be subtracted from the included income amount.

To reflect concessions and the foregoing,

*Decision will be entered under Rule 155.*