**OXFORD LIFE INSURANCE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV 81–1176 PHX CAM.**

United States District Court, D. Arizona.

Oct. 3, 1983.

---

Stephen E. Silver, Burch & Cracchiolo, Phoenix, Ariz., for plaintiff.

James P. Loss, U.S. Atty., Phoenix, Ariz., Nancy Morgan, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

MUECKE, Chief Judge.

This case involves a claim for recovery of taxes paid in connection with a reinsurance transaction entered into between Oxford Insurance Company, plaintiff herein, and Pioneer Insurance Company.

The dispute herein involves the computation of premium income reported by Oxford on its 1973 income tax return, the deductibility of an acquisition cost on a reinsurance transaction, and the timeliness of an election made pursuant to 26 U.S.C. § 818(a).

Defendant, United States, filed a Motion for Partial Summary Judgment, and Plaintiff filed a cross-motion. In addition, Defendant filed a Motion to Strike portions of the plaintiff's cross-motion. In making the following findings of fact, the Court considered all of the motions filed, together with the pertinent responses and replies, as well as the oral arguments of the parties, which were made in open court on June 13, 1983.

FINDINGS OF FACT:

(1) Oxford Life Insurance Company, hereinafter referred to as Plaintiff, was incorporated in 1965, with its principal place of business in Phoenix, Arizona.

(2) In December of 1973, Plaintiff learned that it would acquire from the Pioneer Insurance Company of Lincoln, Nebraska, hereinafter referred to as Pioneer, a block of insurance business, consisting of approximately ten thousand 20-payment whole life policies, written since 1968.

(3) Pursuant to certain documents, entitled Reinsurance Agreement and Amendment to Reinsurance Agreement, dated December 28, 1973, Oxford assumed liability for Pioneer's life insurance policies.

(4) The provisions of the Reinsurance Agreement are not disputed by the parties, and are as follows:

### ARTICLE I

CEDING COMPANY hereby assigns and cedes to REINSURING COMPANY, and REINSURING COMPANY hereby assumes and reinsures each and every life insurance policy issued by the CEDING COMPANY pursuant to its Plan No. 423632 listed in Appendix A, attached hereto, which is in force as of the effective date of this Reinsurance, in accordance with the terms and conditions of such policies and as if the same had been originally issued by REINSURING COMPANY and further assumes and shall be liable after said effective date for all obligations and expenses which may accrue or become due in connection with such policies, including but not limited to the payment of premium taxes and agents' commissions and renewals.

\*　　\*　　\*　　\*　　\*　　\*

### ARTICLE II

The effective date of the reinsurance provided by this Agreement shall be 11:59 p.m., Central Standard Time, December 31, 1973.

\*　　\*　　\*　　\*　　\*　　\*

### ARTICLE III

On or before the 31st day of January, 1974, the CEDING COMPANY shall pay to REINSURING COMPANY a reinsurance premium which shall be calculated as of the close of business December 31,

1973, on the policies set forth in Appendix A as follows: The mean aggregate life reserves therefor plus net advance premiums with accrued interest thereon plus reserve for dividends for the calendar year 1974, less net due and deferred premiums and policy loans with accrued interest thereon (adjusted and unearned interest). Each of the foregoing computations shall be made by and at the expense of the CEDING COMPANY and on the same basis as it would make the same for its 1973 annual statement but for this reinsurance.

REINSURING COMPANY will allow a reinsurance commission to CEDING COMPANY in the amount of $2,500,000 which shall be netted against said reinsurance premium. The actual payment of said net reinsurance premium shall be by means of assignment of evidence of indebtedness to be selected by the REINSURING COMPANY from Appendix C, attached hereto, having unpaid principal balances and accrued but unpaid interest equivalent to the amount of said net reinsurance premium.

\*     \*     \*     \*     \*     \*

### ARTICLE IV

CEDING COMPANY will maintain all records on said policies including computer records through December 31, 1973, at which time they will be used for computations set forth in Article III, and then such records as are necessary to the accounting and administration of said reinsured policies shall be delivered to REINSURING COMPANY. The evidence of indebtedness assigned pursuant hereto shall be delivered to REINSURING COMPANY on or before January 31, 1974, but shall not be removed from the state of Nebraska unless and until REINSURING COMPANY is issued a certificate of authority by the Nebraska Department of Insurance.

\*     \*     \*     \*     \*     \*

### ARTICLE V

REINSURING COMPANY shall, at its own expense, prepare and send Assumption Certificates to the owner of each policy reinsured hereby within sixty days from the effective date of this reinsurance. The CEDING COMPANY will make available its computer system and records for this purpose, without charge to REINSURING COMPANY.

(4) Plaintiff contends that during negotiations held prior to entering into the Reinsurance Agreement with Pioneer, certain inherent problems of the policies were revealed, including:

(a) Pioneer was prohibited by the Insurance Department of the State of Nebraska from writing any new business;

(b) Many of the sales people who sold the subject policies misrepresented them as investment contracts, rather than as policies of insurance;

(c) Demands were being made to Pioneer and various state insurance departments for refunds;

(d) Many of the policies were high-premium, low-coverage policies;

(e) The subject policies were almost exclusively sold to farming people in the midwestern states of Nebraska, Iowa, Kansas and Minnesota;

(f) Pursuant to a short-term option contained in the subject policies, the policyholder could elect, subject to certain conditions, during the eighth through eleventh years of the policies, to receive a paid-up policy in the face amount of the original policy, plus a small cash refund.

(5) Nevertheless, Defendant contends, and Plaintiff does not deny, that several tax advantages to Plaintiff would result from the acquisition of the block of subject policies from Pioneer.

(6) In any event, in accordance with the Reinsurance Agreement mentioned above, a block of policies with a face amount of $58,672,232.00 was assumed by Plaintiff.

(7) Plaintiff was on a preliminary term basis of computing reserves for state insurance department regulatory purposes.

(8) Pursuant to the preliminary term basis, Plaintiff was required to set aside $3,952,531.00 as reserves to cover this particular block of business and also assumed liabilities of Pioneer on the policies, totalling $262,400.23; Pioneer then transferred

tangible property consisting of debt instruments owed by outside parties to it in the total amount of $1,714,931.23.

(9) On its 1973 federal income tax return, Plaintiff deducted assumed liabilities in the amount of $262,400.23 and the reserve it was required to set aside to cover the Pioneer policies, but elected to recompute those reserves on a net level premium basis, pursuant to 26 U.S.C. § 818(c), thereby increasing the deduction for increase in reserves from $3,952,531.00 to $5,101,677.00.

(10) On its 1973 federal income tax return, Plaintiff reported as income the $1,714,931.23 tangible property it had received from Pioneer, and also filed its Annual Statement with the Insurance Department for the State of Arizona, indicating net consideration in the same amount.

(11) The Annual Statement was audited by the Insurance Department of the State of Arizona and approved, and the 1973 and 1974 federal income tax returns were also audited by the Internal Revenue Service, hereinafter referred to as IRS.

(12) Pursuant to the IRS audit, a Statutory Notice of Deficiency for the 1973 and 1974 tax years was issued to Plaintiff for federal corporate income tax deficiencies of $770,205.62 and $351,898.61 plus interest and penalties.

(13) On November 5, 1976, Plaintiff filed a protest with the IRS regarding the proposed adjustments for 1973 and 1974.

(14) However, on or about March 4, 1979, Plaintiff paid the assessments in full.

(15) On March 21, 1980, Plaintiff filed a refund claim with the IRS for the 1974 tax year, claiming a refund for the amount of $351,898.61 contained in the Statutory Notice of Deficiency.

(16) As grounds for its claim, Plaintiff noted that "[R]ecalculations of reserves and of tax should be made due to allowance of Taxpayer's § 818(c) election made on 1973 Income Tax Return and appropriate corresponding adjustments for calculations of Taxpayer's 1974 Income Tax liability will result in a refund of at least the amount claimed hereon."

(17) On or about May 26, 1980, the IRS refunded the tax, penalties and interest in the amount of $487,713.97 to Plaintiff for the 1974 tax year.

(18) On or about November 12, 1980, Plaintiff filed a claim for refund of its 1973 income taxes, penalties and interest in the amount of $1,132,600.41, which claim was disallowed by the IRS by its letter dated October 16, 1981.

(19) On October 26, 1981, Plaintiff then filed its Amended Complaint for refund of its 1973 income taxes, penalties and interest, and Defendant counterclaimed, seeking a repayment of Plaintiff's 1974 income taxes, penalties and interest erroneously refunded.

## MOTION TO STRIKE

Defendant has moved the Court to strike portions of the Affidavit of Mr. Ted Wilkins, which was appended to Plaintiff's Cross-Motion for Summary Judgment, served on Defendant on March 6, 1983.

The statement made by Mr. Wilkins which is objectionable to Defendant concerns his characterization of the interpretation of Mr. Werner Marwitz of the definition for the useful life of an insurance policy. Defendant denies that the purported interpretative statement was ever made by Marwitz, and further requests attorney's fees and court costs for having had to file the Motion to Strike.

It is further suggested by Defendant that a show-cause hearing be held to determine whether counsel for Plaintiff and Mr. Wilkins should be held in contempt of Court for submitting statements under oath "which were known to them to be false."

Plaintiff, in return, denies that the statements made by Mr. Wilkins in his Affidavit were false, and requests that the Motion be stricken from the record.

Rule 56(e) of the Federal Rules of Civil Procedure, 28 U.S.C.A., states: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affi-

ant is competent to testify to the matters stated."

A motion to strike an affidavit was considered by the court in *Wimberly v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir. 1966), and the court noted: "At best, the motion to strike raised an issue as to the admissibility of the evidence offered in the affidavit, and the competency of the affiant to testify to the matters stated therein. These issues are present in every instance where affidavits are filed pursuant to Rule 56. The Court has discretion to disregard those facts which would not be admissible in evidence, and to rely on those facts which are competent evidence."

*Wimberly, supra,* was also cited in a footnote in *American Soc. Etc. v. Murray Communications, Inc.,* 547 F.Supp. 462 (N.D.Ill.1982), and the court held that rather than strike the entire affidavit, it should simply disregard those portions of the affidavit which clearly violate the standards of Rule 56.

In light of the accusations made by counsel for the parties in the papers filed in connection with the instant Motion to Strike, it is notable that the court in *American Soc. Etc., supra,* mentioned that "... [T]he profusion of peripheral motions and acerbic briefs filed ... evidence the wisdom of Oliver Wendell Holmes when he observed that '[l]awyers spend a great deal of their time shoveling smoke.' "

■ In accordance with the holdings in *Wimberly, supra,* and *American Soc. Etc., supra,* the Motion to Strike should be denied, since the Court will disregard those portions of the Wilkins Affidavit dealing with legal conclusions, which may be in violation of the standards of Rule 56 of the Federal Rules of Civil Procedure.

## CROSS–MOTIONS FOR SUMMARY JUDGMENT

The four main issues presented to the Court in connection with parties' cross-motions for summary judgment are as follows:

(1) Whether the intangible value of the block of insurance policies acquired by Plaintiff in 1973 must be included in gross income under 26 U.S.C. § 809(c) as part of the consideration received and as an asset under 26 U.S.C. § 805(b)(4) to be amortized over the reasonably estimated life of the policies acquired;

(2) Whether the reserves, as revalued pursuant to an election under 26 U.S.C. § 818(c) of the policies acquired by Plaintiff from Pioneer must be taken into account in computing income from the reinsurance transaction under 26 U.S.C. § 809(c) and the amounts includible under 26 U.S.C. § 805(b)(4), as an asset attributable to the insurance acquired;

(3) Whether the "reasonably estimated life" of the policies acquired refers to the average period during which the policies remain in force, and

(4) Whether an erroneous refund was made of the taxes and statutory additions attributable to the inclusion in income for 1974 of a distribution from Plaintiff's policyholders' surplus account, where Plaintiff does not refer to this adjustment in its claim for refund.

*Inclusion of Intangible Value in Gross Income:*

The issue of whether the intangible value of the block of insurance policies acquired by Plaintiff in 1973 must be included in gross income is perhaps the most important of the four main issues before the Court, inasmuch as Plaintiff concedes that the second and third issues mentioned above need only be reached if the Court rules in favor of Defendant on the first issue.

Defendant contends that in this assumption reinsurance transaction, the excess of the reserves on the reinsurance acquired over the investment securities received by Plaintiff as initial reinsurance consideration represented the cost to Plaintiff of acquiring the future profit potential of the block of business being reinsured.

Defendant further claims that Plaintiff would accept the long-term nature of the transaction in reporting gains, but would reject it in reporting expenses, which would produce a windfall to Plaintiff by reducing income by an amount of $3,649,141.00.

It is Defendant's conclusion, therefore, that the amount of the initial reinsurance consideration paid to Plaintiff represented a net figure, equal to the value of the block of business acquired by Plaintiff, which should be viewed as the end product of two separate exchanges, both of which must be recognized in the net income and assets of the reinsured, so that Plaintiff must increase income by the amount of reserves assumed.

Under this theory, the second portion, which represented the amount Plaintiff paid for future profit potential to be derived from the reinsured policies must be recognized as an increase to Plaintiff's total assets, as well.

Plaintiff claims that if the Defendant is correct, Plaintiff will be subject to a double tax—one for 1973 on the right to receive future premiums, and one on the premiums when they are actually received.

In *Beneficial Life Ins. Co. v. Commissioner*, 79 T.C. 627 (1982), a life insurance company entered one assumption reinsurance transaction and seven indemnity reinsurance transactions. In each transaction, the company was the assuming or reinsuring company, and received actual consideration from the ceding company in an amount less than the reserve liability actually assumed.

The *Beneficial* court held that with respect to the assumption reinsurance transaction, the company must include in income an amount equal to the reserve liability actually assumed, which amount is not affected by any revaluation of reserves made pursuant to the company's election under 26 U.S.C. § 818(c).

The Tax Court further held that to the extent the assumed reserve liability exceeded the actual consideration received, such excess represented the cost of business acquired, which is amortizable over the useful life of that business, and further, that to the extent the reserve liability assumed exceeded the actual consideration received, such excess represented a cost of issuing insurance which may be subtracted from the included income amount.

Ten years prior to the *Beneficial* decision, the Tax Court in *Kentucky Central Life Ins. Co. v. Commissioner*, 57 T.C. 482 (1972), in which an assumption reinsurance transaction was also involved, held that the difference between the amount of the reserves the company was required to establish and the agreed value of the insurance business ceded must be taken into account in computing the company's gain or loss from operations as consideration in respect of assuming liabilities under contracts not issued by the company.

Specifically, the *Kentucky Central* court noted at 57 T.C. 498 that "[T]o allow petitioner the benefit of § 809(d)(2) deduction for the increase in its reserves necessitated by the sale transaction, without also imputing premium income to it under § 809(c)(1) for the credit it received on the purchase price of * * * business would produce a gross distortion in taxpayer's income, a windfall tax benefit, which is not in keeping with the purpose of Subchapter L...."

Subchapter L is in the portion of the Internal Revenue Code dealing with insurance companies, while 26 U.S.C. § 809 deals with the general provisions regarding accounting for gain and loss from operations.

Furthermore, 26 U.S.C. § 818 deals with accounting provisions, and more specifically, 26 U.S.C. § 818(c) provides, in pertinent part, that "[F]or purposes of this part (other than section 801) at the election of the taxpayer the amount taken into account as life insurance reserves with respect to a contract for which such reserves are computed on a preliminary term basis may be determined on either of the following bases: (1) Exact revaluation ... (2) Approximate revaluation ... If the taxpayer makes an election under either paragraph (1) or (2) for any taxable year, the basis adopted shall be adhered to in making the computations under this part (other than section 801) for the taxable year and all subsequent taxable years unless a change in the basis of computing such reserves is approved by the Secretary ..."

Plaintiff has referred the Court to *Mutual Savings Life Ins. Co. v. United States*, 29 A.F.T.R.2d 72–571 (N.D.Ala.1973), *aff'd on this issue*, 488 F.2d 1142 (5th Cir.1974), wherein a reinsurer instituted a tax refund suit for a determination of the proper tax treatment of its acquisition of two blocks of life insurance policies in a given transaction.

The *Mutual Savings* court, at 488 F.2d 1147, held that: "... neither the law nor the regulations intended tax consequences to flow from anything but the tangible transfers made between the parties in the way that they are made. At no place does the law or the regulations indicate that the intangible value of the policies is to be treated as consideration received from the reinsured."

Nevertheless, in *Mutual Savings*, the court relied upon Treasury Regulation 1.817–4(d)(3), then in force, which did not refer specifically to the assuming company having income equal to the excess of the amount of reserve liability assumed over the tangible consideration received.

Plaintiff has argued that a prime and substantial reason for its having entered into the reinsurance transaction was its reliance on Treasury Regulation 1.817–4(d)(3), example 1 in effect in 1976, which reads as follows:

*Example (1).* On June 30, 1959, X, a life insurance company, reinsured a portion of its insurance contracts from Y, a life insurance company, under an agreement whereby Y agreed to assume and become solely liable under the contracts reinsured. The reserves on the contracts reinsured by X were $100,000. Under the reinsurance agreement, X agreed to pay Y a consideration of $75,000 in cash for assuming such contracts. Assuming no other insurance transactions by X or Y during the taxable year, and assuming that X and Y compute the reserves on the contracts reinsured on the same basis, X had income of $100,000 under section 809(c)(2) as a result of this net decrease in its reserves and a deduction of $75,000 under section 809(d)(7) for the amount of the consideration paid to Y for assuming these contracts. Y has income of $75,000 under section 809(c)(1) as a result of the consideration received from X and a deduction of $100,000 under section 809(d)(2) for the net increase in its reserves.

However, in 1976, amendments were made to the Treasury Regulation, and a new Example (1) provided as follows:

*Example (1).* On June 30, 1959, X, a life insurance company reinsured a portion of its insurance contracts with Y, a life insurance company, under an agreement whereby Y agreed to assume and to become solely liable under the contracts reinsured. The reserves on the contracts reinsured by X were $100,000. Under the reinsurance agreement X agreed to pay Y $100,000 for assuming such contracts and Y agreed to pay X $17,000 for the right to receive future premium payments under this block of contracts. Rather than exchange payments of money, X agreed to pay Y a net amount of $83,000 in cash. Assuming that the reasonably estimated life of the contracts reinsured is 17 years, that there are no other insurance transactions by X or Y during the taxable year, and assuming that X and Y compute the reserves on the contracts reinsured on the same basis, X has income of $100,000 under section 809(c)(2) as a result of the net decrease in its reserves. X has a net deduction of $83,000 ($100,000 – $17,000) under section 809(d)(7). For the taxable year 1959 Y has income of $100,000 under section 809(c)(1) as a result of the consideration received from X and a deduction of $100,000 under section 809(d)(2) for the net increase in reserves and $1,000 ($17,000 divided by 17, the reasonably estimated life of the contracts reinsured), under section 809(d)(12). The remaining $16,000 shall be amortized over the next 16 succeeding taxable years (16 × $1,000 = $16,000) under section 809(d)(12) at the rate of $1,000 for each such taxable year.

While Plaintiff has stated that the revisions to the above Treasury Regulation Ex-

ample should not be applied retroactively, the court in *Security Benefit Life Ins. Co. v. United States*, 517 F.Supp. 740, 759, (D.Kan.1980) held that retroactive regulations may be used to correct errors of law. The *Security Benefit* court also involved an action brought by a life insurance company, seeking recovery of federal income taxes and interest, and involving the two versions of "Example (1)," reproduced above, and the court held that while it is not without limits, the authority of the I.R.S. to make its regulations retroactive is broadly construed, and the primary exception to the rule of retroactivity is where a court finds that the Commission has abused its discretion.

The factors found relevant to the I.R.S.' exercise of its discretionary power in *Security Ben. Life Ins. Co., supra*, 759–761, and which this Court has also considered, are:

(1) whether a taxpayer justifiably relied on settled prior law or policy and whether the putatively retroactive regulation alters that law;

(2) the extent, if any, to which prior law or policy has been implicitly approved by Congress, as by legislative reenactment of pertinent Code provisions;

(3) whether retroactivity would advance or frustrate interest in equality of treatment among similarly situated taxpayers, and

(4) whether according retroactive effect would produce an inordinately harsh result.

■ Furthermore, in *Beneficial Life Ins. Co., supra*, at 642, the Tax Court found that even if reliance would be a defense, the petitioner in that case could not have justifiably relied on old Example (1) as settled law in 1973. The court held: "[F]irst, old example (1) was inconsistent with its companion example (2) which clearly supports respondent's position herein. [F.N. 21—Sec. 1.817–4(d)(3), example (2), Income Tax Regs., prior to the 1976 amendments thereto addressed the situation where an amount equal to assumed reserve liability actually was paid the assuming company which then paid the ceding company a cash bonus for the acquired contracts. That

example reached a result consistent with the current regulations.] Second, this Court's decision in *Kentucky Central*, issued on January 11, 1972, cast serious doubt on the breadth to be given old example (1). We simply are unconvinced that we are presented with a case in which retroactive application constitutes an abuse. Accord *Security Ben. Life Ins. Co. v. United States* ..."

Plaintiff cites several authorities which hold that in view of the complexities of federal taxation, fundamental fairness should prompt the Commissioner to refrain from retroactive assessment of a tax in the absence of such notice or of clear Congressional authorization, and that the consistent construction of a statute by the agency charged with its enforcement is entitled to deference by the courts. *Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978); *United States v. Consumer Life Ins. Co.*, 430 U.S. 725, 97 S.Ct. 1440, 52 L.Ed.2d 4 (1977).

Nevertheless, the Supreme Court also held that "... Congress has delegated the Secretary of the Treasury, not this Court, the task of administering the tax laws of the Nation.... We therefore must defer to the Treasury Regulations that implement the Congressional mandate in some reasonable manner." *Commissioner v. Portland Cement Co.*, 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981).

Moreover, it also seems unlikely to this Court that Plaintiff was not put on notice of the dubious nature of former Example (1) in light of the court's decision in *Southwestern Life Ins. Co. v. United States*, 560 F.2d 627, 641 (5th Cir.1977), which held, *inter alia* that an insurance company, which had bought the capital stock of another insurer and had paid an amount in excess of fair market value of the tangible assets it received could not deduct that amount as an ordinary and necessary business expense in the nature of commissions, but rather was required to amortize the amount over the average life of the policies.

■ Additionally, as a general principle of tax law, when a taxpayer enters into a transaction where it acquires all of the assets of another, the amount of liability assumed is treated as part of the cost of acquiring the tangible and intangible assets received in the transaction. *Crane v. Commissioner*, 331 U.S. 1, 14, 67 S.Ct. 1047, 1054–55, 91 L.Ed. 1301 (1947).

■ Also, each party to a bona fide arm's-length transaction is considered to have received consideration equal to the value it bestows upon the other. *United States v. Davis*, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962).

■ Therefore, this Court finds that Treasury Regulation 1.817–4(d)(3), Example (1) as amended in 1976, is valid and reasonable in treating the reserve liability properly reported for tax purposes as the measure of both the cost and the value of what was acquired by Plaintiff in this assumption reinsurance transaction, and in allocating that acquisition cost among all of the assets acquired, with the amount by which the reserves exceed the fair market value of the tangible assets being allocated to the privilege of taking over the subject policies.

The transaction is the same, in substance, as if the reinsured had paid to the reinsurer an amount of tangible consideration equal to the reserves reported on the business assumed, and the reinsurer, in return, had made a cross-payment to the reinsured as the purchase price for the business, equal to the difference between those reserves and the actual value of the tangible assets received.

*Computation of Amounts Includible Under Income:*

The parties appear to be in agreement that 26 U.S.C. § 818(c) permits a life insurance company using the preliminary term method to elect to recalculate its reserves on a net level method for federal income tax purposes. The result is that while the actual reserves can be computed on the preliminary term method, the Internal Revenue Code permits the insurance company to take a greater deduction on its return for reserves than the amount actually set aside by reporting the reserves on the net level method.

However, it is Defendant's position that the value of the reinsurance acquired from Pioneer was equal to the difference between the assumed reserves as revalued pursuant to § 818(c) and the tangible consideration paid to Plaintiff by Pioneer, which represents the amount by which Plaintiff must increase its income and assets under §§ 809(c)(1) and 805(b)(4).

Under the net level method of reserving, an amount approximately equal to the net valuation premium is added to the reserve each year, including the first year of the policy. Under the preliminary term method, a much lower reserve is created in the first year; thereafter slightly greater annual reserve increases are required than under the net level method, resulting ultimately in the same total reserve over the life expectancy of the insured.

Defendants admit that they are here arguing for the first time that not only must the reported income be increased by the difference between the tangible consideration received by Plaintiff and the liabilities assumed (valued by Plaintiff for book purposes at $2.5 million), but that there must also be reflected an increase of approximately $1.1 million, resulting from the revaluation of reserves pursuant to the § 818(c) election, as well.

Plaintiff contends that Defendant is making an equity argument when it contends that the additional reserves deduction caused by the § 818(c) election results in some form of distortion of income or undesirable result and that the Defendant fails to recognize that life insurance companies are taxed under an entirely separate section of the Internal Revenue Code.

In *Western National Life Ins. v. Commissioner*, 51 T.C. 824, 830 (1969), *rev'd*, 432 F.2d 298 (5th Cir.1970), the court characterized life insurance taxation as a "fantasy world," which does not necessarily follow the general principles of income taxation. In *Western National*, the court held that a life insurance company, which accrued deferred and uncollected annual

premiums in order to comply with state statute requirements was required, in computing taxable income under the Life Insurance Company Income Tax Act of 1959, 26 U.S.C. § 801, *et seq.*, to include in the assets column the gross amount of deferred and uncollected premiums.

Nevertheless, *Western National* did not involve an assumption reinsurance transaction, but a newly-written policy, and income would not necessarily be distorted to the same degree in the former as in the latter. In summary, then, it would be incorrect for Plaintiff to conclude that a Congressionally-intended result applicable to directly-written insurance would be equally applicable to an assumption insurance transaction.

Regarding the issue of burden of proof where the computation of amounts includible in income is involved, the First Circuit has held that "[t]o place the burden ... on the government when it moves to collect assessed taxes would encourage taxpayer delay and inaction, thereby imposing on the government the costs and burdens both of borrowing money to meet the gap of unpaid taxes and of initiating litigation ... [and] would also undermine the recordkeeping requirements, thereby making the government's case more difficult, if not impossible, to establish. We therefore hold ... the burdens of both going forward and ultimate persuasion are on the taxpayer." *United States v. Rexach,* 482 F.2d 10, 17 (1st Cir.1973); *cert. den.,* 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973).

The Court in *Aniline Co. v. Commissioner,* 316 F.2d 701 (1st Cir.1963) also held that the taxpayer never loses the burden of proving that the Commissioner's determination is erroneous.

Finally, it is undisputed by the parties that adoption of a different method of valuing reserves necessarily results in changes to items other than the amounts of the reserves themselves—namely, the computation of assets under § 805(b)(4) and the computation of premium income under § 809(c)(1). Therefore, if the § 818(c) election is construed only to affect the § 809(d)(2) deduction from income, it will create the very disparity for which § 818(c)

was enacted to alleviate. *Report of the House Ways and Means Committee,* H.R. Rep. No. 34, 86th Cong., 1st Sess. at 17–18 (1959–2 Cum.Bull. 736, 748).

■ Accordingly, this Court finds that neither a gain nor a loss should flow from the § 818(c) election, but rather, income and assets should be correspondingly adjusted to equal the offsetting deduction from income which results from the revaluation.

*Period of Amortization:*

It is Defendant's position that Plaintiff is entitled to amortize the asset "reinsured policies" pursuant to § 809(d)(2) over the reasonably estimated life of such policies. Treasury Regulation Section 1.817–4(d)(2)(iv) defines "reasonably estimated life" as: " * * * the period during which the contract reinsured remains in force. Such period shall be based on the facts in each case ... and the assuming company's experience ... with similar risks."

Defendant interprets that regulation to mean that the reinsured policies in the instant case must be amortized over the average period during which the reinsured policies are estimated to remain in force.

Plaintiff contends that the above regulation is confusing since the term "in force" is not defined. Plaintiff further states that the above regulation is in conflict with § 1.817–4(d)(3), but fails to specify what the conflict is or how it should affect this Court's ruling on the issue of the determination of the applicable period of amortization. Defendant, on the other hand, claims that there is no conflict involved, since the Treasury Regulation defines a reasonably estimated life for purposes of amortizing a block of reinsurance policies and the examples mentioned above illustrate the definition assuming the reasonably estimated life to be seventeen years.

The *Kentucky Central* court, *supra,* also held that amortization would be allowable over the estimated average life of the reinsured policies, as did the court in *Man-*

*hattan Co. of Virginia Inc. v. Commissioner,* 50 T.C. 78 (1968).

This Court is of the further opinion that the economic return to Plaintiff on the policies does not come solely from receiving premiums, but also from investment income and mortality gains derived from an insured outliving his life expectancy.

■ For the above reasons, the reinsured policies in the instant case should be amortized over their reasonably estimated life, which is the average period during which they are expected to remain in force.

*Erroneous Refund:*

Defendant finally claims that an erroneous refund was made to the extent of the inclusion in income for 1974 of a distribution from Plaintiff's policyholders' surplus account. Adjustments made by Defendant for Plaintiff's 1973 tax year allegedly resulted in a distribution of $825,214.99, increasing Plaintiff's income by this amount.

It is clear from 26 U.S.C. § 7422(a) that "[N]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate ..."

■ Regarding the sufficiency of a refund claim, if the Commissioner "... understands the grounds and deals with the claim on the basis of his understanding, the claim is sufficient." *Keneipp v. United States,* 184 F.2d 263, 267 (D.C.Cir.1950).

■ Additionally, in undertaking to respond to a claim for refund, the Commissioner is obliged to investigate only those claims for which the taxpayer has set forth both grounds and supporting facts. *Fearis v. C.I.R.,* 548 F.Supp. 408 (D.C.Tex.1982).

■ The Amended U.S. Corporation Income Tax Return (Form 1120X) filed by Plaintiff for 1974, when read in light of all the facts and circumstances herein, should have provided notice to the Commissioner of Plaintiff's objection to the $825,214.99 adjustment.

■ Of course, a failure to raise factual and legal grounds in a claim for refund would act to bar a recovery on such a claim in a subsequently filed suit for refund. *United States v. Felt & Tarrant Mfg. Co.,* 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025 (1931); *French v. Berliner,* 218 F.2d 351 (9th Cir.1955).

Specifically, Treasury Regulation § 301.-6402–2(a)(1) states that tax overpayments may not be refunded after the statute of limitations has expired unless, before the expiration, a claim has been filed by the taxpayer.

■ It is also clear, in this connection, that the two-year limit on suits to collect erroneous refunds does not affect the right of the Internal Revenue Service to use other summary procedures for the collection of interest due on delinquent taxes. *Ideal Realty Co. v. U.S.,* 561 F.2d 1123 (4th Cir.1977).

Furthermore, Plaintiff contends that the refund was allowed without the Defendant having first referred the claim to the Joint Committee on Taxation, and Defendant does not deny this.

Defendant's action therefore appears to be in direct contravention of 26 U.S.C. § 6405(a), which states: "No refund or credit of any income ... in excess of $200,-000 shall be made until after the expiration of 30 days from the date upon which a report ... and a summary of facts and the decision of the Secretary, is submitted to the Joint Committee on Taxation."

Even in cases where a statute of limitations defense has been found to be a bar to the Government's collection of an erroneous refund to a taxpayer, it has been held that were there no statute of limitations bar, the doctrine of equitable estoppel would have been sufficient to produce the same result in view of the fact that the government had advised the taxpayer that its tax liability for the years in question had been correctly disposed of. *C & R Investments, Inc. v. United States,* 267

F.Supp. 932 (D.C.Kan.1967), *cause remanded* 404 F.2d 314 (10th Cir.1968), *on remand* 310 F.Supp. 222 (D.C.Kan.1969), *affirmed* 444 F.2d 765 (10th Cir.1971).

 Therefore, the Court cannot be in a position to rule on the issue of an allegedly erroneous refund unless and until the Internal Revenue Service submits its report, summary of facts, and decision of the Secretary concerning this issue to the Joint Committee on Taxation, pursuant to 26 U.S.C. § 6405.

Accordingly,

IT IS ORDERED that as to the first three issues presented to the Court, Defendant's Motion for Partial Summary Judgment is granted and Plaintiff's Motion for Summary Judgment is denied, to-wit:

(1) The intangible value of the block of insurance policies acquired by Plaintiff in 1973 should be included in gross income under 26 U.S.C. § 809(c) as part of the consideration received and as an asset under 26 U.S.C. § 805(b)(4), to be amortized over the reasonably estimated life of the acquired policies.

(2) The reserves on the acquired policies should be taken into account in computing income from the reinsurance transaction under 26 U.S.C. § 809(c) and the amounts includible under 26 U.S.C. § 805(b)(4) as an asset attributable to the acquired policies.

(3) The "reasonably estimated life" of the policies acquired should be interpreted to mean the average period during which the policies remained in force.

IT IS FURTHER ORDERED that both Plaintiff's Motion for Summary Judgment and Defendant's Motion for Partial Summary Judgment are denied as to the issue of an erroneous refund by Defendant to Plaintiff, since the Defendant must first comply with the requirements of 26 U.S.C. § 6405 before this Court is in a position to rule on the issue.

IT IS FURTHER ORDERED that the status hearing set for September 12, 1983, at 10:00 a.m. by minute entry of August 16, 1983 is vacated, and the parties are to comply with Rule 42(C) of the Rules of Practice of the United States District Court

for the District of Arizona no later than forty-five (45) days from the date this Order is filed or November 14, 1983.