OXFORD LIFE INSURANCE COMPANY, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 84–2835.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 10, 1985.

Decided May 30, 1986.

**1372**

Theodore R. Groom, Groom & Nordberg, Washington, D.C., for plaintiff-appellant.

Michael L. Paup, U.S. Dept. of Justice, and Gary R. Allen, Atty., Washington, D.C., for defendant-appellee.

Before SKOPIL, FLETCHER and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

Oxford Life Insurance Company (Oxford) appeals the district court's dismissal of Oxford's suit for the refund of federal income taxes paid in 1973 and grant of summary judgment for the government on Oxford's erroneous refund counterclaim for 1974. *See* 574 F.Supp. 1417 (D.Ariz.1983). Oxford sought to recover federal income taxes paid in connection with an assumption reinsurance transaction in which it acquired a block of 10,000 life insurance policies from another insurance company. We affirm the district court's decision in part, reverse in part, and remand for a determination of the length of the amortization period.

This appeal involves the tax consequences of an assumption reinsurance transaction. In an assumption reinsurance transaction, one insurance company, the ceding company or reinsured, transfers certain of its policies to another insurance company, the assuming company or reinsurer. The assuming company steps into the ceding company's shoes—it assumes the statutory reserve liability on the policies; it gains entitlement to all future premiums; and it becomes directly liable to the policy holders. *Beneficial Life Insurance Co. v. Commissioner*, 79 T.C. 627, 636 (1982). All life insurance companies are required by state insurance laws to set aside minimum life insurance reserves on their policies. These reserves are estimates of the present value of future benefit payments to policy holders. Accordingly, after a reinsurance transaction, the assuming company establishes reserves on its books to cover the newly-acquired policies, and the ceding company decreases its annual statement reserves by the amount of reserves previously maintained on the transferred policies.

## FACTS

In 1973, Oxford, an Arizona corporation, entered into an assumption reinsurance agreement with Pioneer Insurance Company (Pioneer), a Nebraska corporation, to acquire a block of insurance business, consisting of approximately 10,000 twenty-payment whole life policies written by Pioneer with a face value of $58,672,232.00. Under the agreement, Pioneer, the ceding or reinsured company, agreed to pay Oxford, the assuming company or reinsurer, a reinsurance premium for the policies Oxford was assuming. The reinsurance premium consisted of (1) the amount of reserves that Oxford would have to establish on its books as required by state law for the transferred policies ($3,952,531), and (2) other liabilities assumed by Oxford on the policies ($262,400.23), for a total reinsurance premium of $4,214,931.23. In turn, Oxford agreed to pay Pioneer a reinsurance commission of $2,500,000 to be netted against the reinsurance premium Oxford was to be paid. Because the agreement provided for transfer only of the net sum

of the two obligations, Oxford received from Pioneer the 10,000 policies and tangible assets worth $1,714,931.23.

On its 1973 federal income tax return, Oxford reported as income the $1,714,-913.23 tangible property, or net amount, that it had received from Pioneer. Against this income, Oxford deducted both the liabilities it had assumed from Pioneer and the reserves it was required to set aside to cover the transferred Pioneer policies. Oxford also elected to recompute its reserves on a net level premium basis pursuant to 26 U.S.C. § 818(c) (1970), thereby increasing its deduction for the newly-established reserves from $3,952,531 to $5,101,677. Thus, Oxford was able to report a $3.7 million loss on the reinsurance transaction.

On audit by the IRS, Oxford was issued deficiency notices for the tax years 1973 and 1974, and Oxford paid the assessments in full. Oxford filed claims for refunds for both 1973 and 1974, but the IRS granted a refund only for the 1974 tax year. On October 26, 1981, Oxford filed an amended complaint in district court seeking refund of its 1973 income taxes. The government counterclaimed for repayment of Oxford's 1974 income tax refund. On cross-motions for partial summary judgment, the district court granted the government's motion as to the 1973 tax year, finding that (1) Oxford must also include the intangible value of the policies in income; (2) the cost of acquiring the policies from Pioneer must be amortized over the life of the policies, and is not currently deductible; and (3) if the reserves were revalued under section 818(c), Oxford's income and assets should be correspondingly adjusted. After the government moved for summary judgment on the remaining issues, the court dismissed Oxford's refund suit for 1973 and granted the judgment for the government on its counterclaim for 1974.

## DISCUSSION

The three issues involved in this case arise under the Life Insurance Company Income Tax Act of 1959, Pub.L. No. 86–69,

73 Stat. 112, as set forth in sections 801 through 820 of Title 26. The crucial issue is whether a reinsurer such as Oxford must include in income under 26 U.S.C. § 809(c) (1970) an amount equal to the reserve liability assumed on the transferred policies. If we find Oxford is required to include this amount in income, we must then determine whether the excess of the reserve liability over the tangible consideration received by Oxford is currently deductible or represents the cost of acquiring an asset and is therefore amortized over the useful life of that asset. Finally, we must decide what effect a revaluation of reserves under 26 U.S.C. § 818(c) (1970) has on the amount included in income. As these issues present legal questions, this court's review is de novo. *First Charter Financial Corp. v. United States,* 669 F.2d 1342, 1345 (9th Cir.1982).

### A. OXFORD'S INCOME

When determining gain or loss from operations, a life insurance company is required under section 809(c)(1) to include in income consideration received "in respect of assuming liabilities under contracts not issued by the taxpayer." On its 1973 tax return, Oxford included in income under section 809(c)(1) only the $1.7 million in net tangible assets it received from Pioneer. Oxford also deducted under section 809(d)(2) the reserves it was required to establish on the policies and the other liabilities assumed, resulting in at least a $2.5 million loss.[1]

The government does not contest the deductions but contends that Oxford must include in its income an additional amount of consideration received from Pioneer for assuming the liabilities on the policies. This additional consideration is the intangible value of the policies as represented by the excess of the reserves over the tangible assets actually received by Oxford. Oxford alleges that its income should be limited to the net tangible assets it received which gave Oxford an immediate and abso-

---

**1.** Oxford also elected to revalue its reserves under section 818(c), creating a $3.7 million loss.

lute right to income. Oxford contends that its income should not include the value of the block of policies because there is no assurance that Oxford will receive future premium payments from the policy holders.

■ We find that the reinsurer's income in an assumption reinsurance transaction under section 809(c) includes the intangible value of the block of insurance policies acquired. *Beneficial Life Insurance Co. v. Commissioner,* 79 T.C. 627, 637–40, 651 (1982); *Kentucky Central Life Insurance Co. v. Commissioner,* 57 T.C. 482, 497–500 (1972); Treas.Reg. § 1.817–4(d)(2)(iii). As the district court noted, in substance, Pioneer paid Oxford an amount of tangible consideration equal to the reserves required on the reinsured policies, and, in return, Oxford paid Pioneer a purchase price for the transferred policies equal to the difference between the reserves and the value of the tangible assets actually received. 574 F.Supp. at 1426. *See Beneficial Life,* 79 T.C. at 639. To hold differently would enable Oxford, in accepting the long-term nature of the transaction as to reporting gains but not as to reporting expenses, to claim an artificial tax loss, when in fact Oxford has acquired a block of valuable policies with the right to their future income.[2]

■ Oxford gained more than new liabilities in the transaction; in addition to the tangible assets from Pioneer, it acquired valuable life insurance policies. Under general principles of tax law, the value of properties exchanged in an arm's length transaction is presumed to be equal. *United States v. Davis,* 370 U.S. 65, 72, 82 S.Ct. 1190, 1194, 8 L.Ed.2d 335 (1962); *Kentucky Central,* 57 T.C. at 496. Where a taxpayer acquires all the assets of another in a transaction, the amount of liability assumed is treated as part of the cost of acquiring the tangible and intangible assets received. *Commissioner v. Tufts,* 461 U.S.

300, 306, 313, 103 S.Ct. 1826, 1830, 1834, 75 L.Ed.2d 863 (1983); *Crane v. Commissioner,* 331 U.S. 1, 14, 67 S.Ct. 1047, 1054–55, 91 L.Ed. 1301 (1947).

■ Moreover, Oxford's contention that it should be allowed to recognize a start-up loss on the assumed policies in the same manner as direct insurers is inapt. Oxford's position is not analogous to a direct insurer which sells individual policies through agents and is responsible for high first-year costs, including commissions, medical reports, and operating expenses. While Congress may have recognized that small direct insurers initially face high losses when placing new policies on the company books, the reinsurer of insurance is in a different position. *Kentucky Central,* 57 T.C. at 499. In one transaction, Oxford acquired 10,000 new life insurance policies. Basically, an assumption reinsurance transaction is treated under the tax code as a sale by the ceding company to the reinsuring company. *Beneficial Life,* 79 T.C. at 645.

■ We are aware that the tenth and fifth circuits have held that section 809(c)(1) requires the reinsurer to include in income only the tangible assets actually received and not an additional amount of consideration for the intangible value of the policies. *Security Benefit Life Insurance Co. v. United States,* 726 F.2d 1491, 1495–96 (10th Cir.1984); *Mutual Savings Life Insurance Co. v. United States,* 488 F.2d 1142, 1145 (5th Cir.1974). The transactions in these two cases did not explicitly involve offsetting obligations, although admittedly the net effect was similar to Oxford's situation. More importantly, both decisions relied on an earlier more ambiguous version of Treas. Reg. 1.817–4(d) and Example 1, which was amended in 1976 and now applies specifically to the netting transaction described here.[3] Even though

---

2. Moreover, Oxford will receive income even if policyholders cancel and make no payments at all to Oxford. To the extent that policies are canceled, Oxford will realize income from reduction in the reserves it is required to maintain to protect those policies.

3. Oxford raised the issue below that it relied upon the earlier version of the regulation in entering into the transaction, but it does not appeal the district court's determination that the 1976 amendment to the regulation may be applied retroactively. *See* 574 F.Supp. at 1424–25;

*Security Benefit* was decided after the 1976 amendment, that court chose to defer to the earlier version of the treasury regulation in effect before 1976 rather than accept the later modification supporting the position of the government here. *Security Benefit,* 726 F.2d at 1494. Nevertheless, the *Security Benefit* court was clearly concerned that the amount of reserves in that transaction had been set at an artificially high figure and did not reflect the true value of the items exchanged in the transaction. *Id.* at 1495. Here, we have no indication of an overvaluation, particularly in light of the reinsurance commission paid to Pioneer. In any event, to the extent *Security Benefit* can be read to stand for the proposition that the current treasury regulation is an incorrect statement of the law, we think it is wrong.

## B. OXFORD'S COST

■ When Oxford includes in income an amount equal to the reserve liability assumed, the excess by which the assumed liability exceeds the tangible consideration it received represents Oxford's cost in acquiring the block of insurance policies. Oxford contends that even if it must include the intangible value of the policies in income, it is nevertheless entitled to immediately deduct the $2.5 million paid to Pioneer either as a commission under section 809(d)(12) or as a return premium under section 809(c)(1).[4] We reject Oxford's arguments and affirm the district court's decision that the cost of acquiring the block of insurance business is amortizable over the estimated life of the acquired policies, rather than immediately deductible. Treas.

Reg. 1.817–4(d)(2)(ii)(B);[5] *see Southwestern Life Insurance Co. v. United States,* 560 F.2d 627, 640–41 (5th Cir.1977), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978); *Beneficial Life,* 79 T.C. at 642–43; *Kentucky Central,* 57 T.C. at 500; *see also Mutual Savings,* 488 F.2d at 1144 (in general agreement on this issue).

■ Oxford paid Pioneer a $2.5 million purchase price for the future income inherent in the reinsured policies. An amount paid to acquire an asset having a useful life of many years is not a deductible expense, but rather amortizable over the useful life of the asset. *See United States v. Mississippi Chemical Corp.,* 405 U.S. 298, 310, 92 S.Ct. 908, 915, 31 L.Ed.2d 217 (1972) (co-op bank stock); *Honodel v. Commissioner,* 722 F.2d 1462, 1465 (9th Cir.1984) (investment fees in acquiring stock). Oxford must deduct the cost of purchasing the policies on an amortized basis under the appropriate treasury regulation unless there is some particular provision that applies to this situation.

■ Under section 809(d)(12), a life insurance company is entitled to the same deductions as other taxpayers, including ordinary and necessary business expenses. Again analogizing its position to a direct insurer who can deduct commissions made to agents, Oxford claims that the money paid to Pioneer for the policies was its cost of doing business, whether it bought a block of policies or paid salesmen directly. Oxford has no statutory authority to support its position and its comparison to a direct insurer is inaccurate. Pioneer al-

*See also Beneficial Life,* 79 T.C. at 641–42 (retroactive application). Oxford does assert that the current version of the regulation is contrary to the statutory provisions. We disagree. The interpretation embodied in the regulation properly characterizes the assumption reinsurance transaction for tax purposes.

4. Under this theory, the tax consequences to Oxford would be the same as if it were only required to include the tangible assets received in income. In its 1973 tax return, Oxford reported income of $1.7 million, deducted $4.2 million in reserves and liabilities and claimed a $2.5 million loss, before the section 818(c) reval-

uation. Under this alternate theory, Oxford would report income of $4.2 million and deduct, not only $4.2 million in reserves and liabilities, but also the reinsurance commission of $2.5 million. The outcome is the same under either theory.

5. Treas.Reg. § 1.817–4(d)(2)(ii)(B) specifically precludes an immediate deduction for an amount paid for a block of insurance and requires the taxpayer to "treat any amount paid to the reinsured ... as a deferred expense that may be amortized ...."

ready paid commissions to its agents when it issued the policies. The money paid to Pioneer does not represent a commission in the ordinary sense but the value to Oxford of having this block of policies on its books with the expectation of continuing premiums to be paid in the future. *See Southwestern Life,* 560 F.2d at 641.

■ Furthermore, Oxford's position is not similar to indemnity reinsurers who currently deduct reinsurance commissions.[6] Assumption reinsurance transactions receive different treatment in the tax code from that accorded indemnity reinsurance transactions because of the transfer of assets. An assumption reinsurance transaction is treated as a sale of the policies; an indemnity reinsurance transaction is the purchase of insurance protection from the reinsured. *Beneficial Life,* 79 T.C. at 645–46.

■ Oxford's contention that the payment to Pioneer constitutes an immediately deductible "return premium" under section 809(c)(1) also fails. Section 809(c)(1) subtracts from the consideration received as income "return premiums and other consideration arising out of reinsurance ceded." It further provides:

> Except in the case of amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded, amounts returned where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management shall not be included in return premiums.

■ The exception created in the statute for "reinsurance ceded" specifically refers to indemnity reinsurance. Treas.Reg. § 1.809–4(a)(1)(iii); S.Rep. No. 291, 86th Cong., 1st Sess. at 54 (1959–2 Cum.Bull. 809). Thus, indemnity reinsurers may subtract from income any consideration returned to the ceding company with respect

to the reinsurance ceded. *Beneficial Life,* 79 T.C. at 646. The purchase price paid by Oxford is not, however, "return premiums and other consideration arising out of reinsurance ceded."

There is nothing in section 809(c)(1), the legislative history, or the treasury regulations that indicates that assumption reinsurers, as direct insurers, are entitled to exclude return premiums from gross premium income. *See* S.Rep. No. 291, 86th Cong., 1st Sess. at 54 (1959–2 Cum.Bull. 809). Under Treas.Reg. 1.809–4(a)(1)(ii), return premiums are "amounts returned or credited" and include "amounts refunded due to policy concellations or erroneously computed premiums." While the regulation notes that the definition of return premiums is specifically broadened in the case of indemnity reinsurers, *see* Treas.Reg. 1.809–4(a)(1)(ii) and (iii), assumption reinsurers, as noted earlier, receive different treatment in the tax code. *See Beneficial Life,* 79 T.C. at 646–47. Return premiums relate to premiums charged in selling insurance, amounts which are returned or credited on policies, and not, as the case here, when one insurance company purchases a block of policies from another.

## C. REVALUATION OF RESERVES

■ Insurance companies use two basic methods to compute reserves: the net level premium method and the preliminary term method. Under the net level premium method, the amount added to the reserves each year is constant over the life of the policy. Under the preliminary term method, the amount added to the reserves is lower in the first year, but higher during the remaining years. Expenses incurred by insurance companies in the first year of a policy are greater than expenses in later years. Thus a company may chose to use the preliminary term method to compute

---

**6.** In an indemnity reinsurance transaction, the reinsurer does not become directly liable to the policy holders. The reinsurer simply agrees to indemnify the issuing company for a specified portion of the amounts that may become pay-

able under the reinsured policies. *See* S.Rep. No. 291, 86th Cong., 1st Sess. at 38–39, U.S.Code Cong. & Admin.News 1959, p. 1575 (1959–2 Cum.Bull. 770, 797–98).

reserves for its National Association of Insurance Commissioners Annual Statement in order to present a stronger financial picture. For tax purposes, however, companies prefer to compute reserves under the net level premium method, which allows a greater reserve deduction in the first year of a policy's life. Under section 818(c), a company may use the preliminary term method for annual statement purposes and the net level premium method for tax purposes. *See Security Benefit*, 726 F.2d at 1496–97.

■■■ Oxford established reserves for the new policies in the amount of $3.95 million and was entitled to deduct these reserves under section 809(d)(2). Oxford elected under section 818(c) to revalue all of its reserves, including the reserves on the Pioneer policies, from a preliminary term basis to the net level premium basis, thereby increasing its reserve deduction on the Pioneer policies from $3.95 million to $5.1 million. The district court held that because neither a gain nor loss should flow from the section 818(c) election, Oxford's income should also be adjusted to equal the offsetting deduction. 574 F.Supp. at 1427. We reverse the district court on this issue.

■■■ An election under section 818(c) only affects the computation of the deduction for reserves under section 809(d)(2) and does not affect the computation of premium income under section 809(c)(1). *Security Benefit*, 726 F.2d at 1498–99; *Reserve Life Insurance Co. v. United States*, 640 F.2d 368, 378, 226 Ct.Cl. 169 (1981); *Beneficial Life*, 79 T.C. at 650–51. The language of the code does not require a life insurance company to recompute its assets and gross premium income when it elects to increase its deduction for reserves under section 818(c).[7] *Beneficial Life*, 79 T.C. at

650–51. Oxford's election to revalue its reserves under section 818(c) was made independent of the reinsurance agreement and after the transaction closed.

Requiring Oxford to recognize the value of the policies it received as income equal to the amount of assumed reserves and liabilities simply reflects the economic realities of the transaction. Oxford was compensated by Pioneer for assuming those liabilities. Recalculating the deduction for reserves under section 818(c), however, is solely for tax purposes and thus should not affect the imputed income received by Oxford. *See Beneficial Life*, 79 T.C. at 650.

## D. REMAND

In its refund claim, Oxford did not challenge the government's determination that the cost of acquiring the policies was to be amortized over a 17 year period. Oxford would not be entitled to litigate this issue without a waiver by the government of the defense of variance. See *Ladd v. Riddell*, 309 F.2d 51, 54 (9th Cir.1962). The government, however, concedes that it waived its variance defense, and we remand to the district court for trial on the length of the amortization period.

## CONCLUSION

We affirm the district court's holding that Oxford must include in income an amount equal to the reserve liability assumed and that the excess of the reserve liability over the tangible assets received is Oxford's cost in acquiring the policies, which must be amortized over the life of the policies. We reverse the district court's decision that Oxford's income must be adjusted to include the revaluation of reserves under section 818(c). Finally, we

---

7. The government argues that the revaluation must be included in income based on the language of the statute which provides that: "the basis adopted shall be adhered to in making the computations under this part (other than section 801) for the taxable year and all subsequent taxable years." Section 818(c). The word "basis" here means, not the cost of the property or the amount of the reserves, but the method of computing reserves. *Reserve Life*, 640 F.2d at 377. The purpose of this provision is to ensure that a company continues to use the same method for computing reserves on its policies from year to year—not that the company adopt the net level premium method for all purposes. *Security Benefit*, 726 F.2d at 1498; *Reserve Life*, 640 F.2d at 377; *Beneficial Life*, 79 T.C. at 650–51.

remand the case for a determination on the length of the amortization period.

Each party shall bear its own costs on this appeal.