**SECURITY BENEFIT LIFE INSURANCE COMPANY, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 81–1413.**

United States Court of Appeals, Tenth Circuit.

Jan. 30, 1984.

**1492**

David English Carmack, Atty., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup and Gary R. Allen, Attys., Tax Div., Dept. of Justice, Washington, D.C.; of counsel: Jim J. Marquez, U.S. Atty., and Mary K. Briscoe, Asst. U.S. Atty., Topeka, Kan., with him on the briefs), for defendant-appellant.

E.P. Baker, Washington, D.C. (Peter H. Winslow, also of Scribner, Hall & Thompson, Washington, D.C., and Larry Armel, Security Ben. Life Ins. Co., Topeka, Kan., with him on the brief) for plaintiff-appellee.

Before BARRETT, McKAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Security Benefit Life Insurance Company (SBL) sued pursuant to I.R.C. § 7422 to recover federal income taxes, plus interest, that SBL allegedly overpaid for its taxable year 1968. SBL based its claim on the carryback to 1968 of a loss incurred in 1971 from two unrelated events: (1) SBL's acquisition of all the life insurance business of a fraternal benefit society, the Ladies' Society of the Brotherhood of Locomotive Firemen and Enginemen (Society), and (2) a change in SBL's method of accounting for loading on deferred and uncollected premiums as a consequence of *Commissioner v. Standard Life & Accident Insurance Co.,* 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977). The district court ruled in favor of SBL on nearly all the issues relating to both events, *Security Benefit Life Insurance Co. v. United States,* 517 F.Supp. 740 (D.Kan. 1980), and the government appealed.

I

The first issue involves the tax treatment of assumption reinsurance transactions. The Society provided funeral and life insurance benefits to its members. Because of decreasing membership, the advancing age of its members, and a decline in value of the assets in its portfolio, the Society faced an "assessment spiral." Despite the assessment spiral, a firm of consulting actuaries concluded that the fund was financially sound. Nevertheless, the Society approached SBL asking it to assume the Society's obligations to its members.

The parties agreed to an arrangement whereby the annual premiums charged Society members were raised from $12 to $15 per $1,000 of coverage, SBL assumed all liabilities under the policies, and the Society transferred to SBL all assets it had set aside to fund the benefits due under the policies. As a result of this transaction and with the approval of the Kansas Insurance Commissioner, the taxpayer increased its reserves by $7,554,519. The reserve adjustment was determined by calculating the present value of future benefits as of July 1, 1971, using the 1958 C.S.O. table and an assumed rate of interest of 3½%, reduced by the present value of annual net premiums of $15 per $1,000 to be received after July 1, 1971, for each contract in which the insured had attained the age of 38, and a lesser annual net premium if the insured was under that age. The 1958 C.S.O. table was a recognized mortality table within the meaning of I.R.C. § 801(b)(1)(A), and the 3½% assumed rate of interest was the maximum allowed by Kansas law, resulting in

the lowest possible reserve. *See* 517 F.Supp. at 749–50.

Under I.R.C. § 809(c)(1), an insurance company must include in its income consideration received "in respect of assuming liabilities under contracts not issued by the taxpayer" and is entitled to deduct under § 809(d)(2) the net increase in its qualifying life insurance reserves resulting from the acquisition of these policies. SBL reported the acquisition of the Society's insurance business on its 1971 return by deducting $7,554,519, the increase in reserves attributable to the block of business acquired, calculated in accordance with state law. *See* Treas.Reg. § 1.801–5. SBL included in income the $5,943,814 worth of assets received in return for assuming these liabilities. The thrust of the government's argument is that no company would assume $7,554,519 of liabilities in return for $5,943,814 in assets and that this transaction must therefore also involve an additional $1,769,111, which SBL must recognize as additional consideration paid, amortizable over ten years as the cost of acquiring the policies. The district court rejected the IRS position on this issue. We affirm.

When SBL filed its 1971 income tax return, including only the $5,943,814 fair market value of the assets it received from the Society as "consideration" and taking a deduction for the reserves, SBL followed to the letter the Treasury Regulations and Examples that had been in effect since 1962. Treas.Reg. § 1.817–4(d)(2)(ii) (amended 1976) provided:

"In connection with an assumption reinsurance (as defined in paragraph (a)(7)(ii) of § 1.809–5) transaction, a reinsurer shall in any taxable year beginning after December 31, 1957—

(a) Treat the consideration received from the reinsured in any such taxable year as an item of gross amount under section 809(c)(1), and

(b) Treat any amount paid to the reinsured, to the extent such amount meets the requirements of section 162, as a deferred expense under section 809(d)(12) and amortize such amount over the reasonably estimat-

ed life (as defined in subdivision (iii) of this subparagraph) of the contracts reinsured, irrespective of the taxable year in which such amount was paid to the reinsured."

The regulation then set forth four examples illustrating the tax consequences of assumption reinsurance transactions. Example (1), which is indistinguishable from the instant transaction, provided:

"*Example (1).* On June 30, 1959, X, a life insurance company, reinsured a portion of its insurance contracts with Y, a life insurance company, under an agreement whereby Y agreed to assume and become solely liable under the contracts reinsured. The reserves on the contracts reinsured by X were $100,000. Under the reinsurance agreement, X agreed to pay Y a consideration of $75,000 in cash for assuming such contracts. Assuming no other insurance transactions by X or Y during the taxable year, and assuming that X and Y compute the reserves on the contracts reinsured on the same basis, X has income of $100,000 under section 809(c)(2) as a result of this net decrease in its reserves and a deduction of $75,000 under section 809(d)(7) for the amount of the consideration paid to Y for assuming these contracts. *Y has income of $75,000* under section 809(c)(1) as a result of the consideration received from X *and a deduction of $100,000* under section 809(d)(2) for the net increase in its reserves."

*Id.* § 1.817–4(d)(2)(iii) (emphasis added). Example 1 did not impute income of $25,000 or any other amount to the reinsurer as a cost of acquiring the business, and none of the three examples which followed Example 1 suggested that an imputation of income was appropriate. Like the company in Example 1, SBL included in income the $5,943,814 value of the assets it received from the Society and took a deduction for the $7,554,519 increase in its reserves. Also like the company in Example 1, SBL did not recognize any income for the difference between the value of the assets received and the increase in its reserves because of the transaction.

One of the assumption reinsurance. transactions in *Mutual Savings Life Insurance Co. v. United States,* 488 F.2d 1142 (5th Cir.1974), was substantially identical to the one in the instant case. The Fifth Circuit held for the reinsurer, refusing to require that it recognize income for the difference between the value of cash received for the assumption and the reserves it established. That court said,

"It appears clear, therefore, that neither the law nor the regulations intended tax consequences to flow from anything but the tangible transfers made between the parties in the way that they are made. At no place does the law or the regulations indicate that the intangible value of the policies is to be treated .as consideration received from the reinsured."

*Id.* at 1147.

Partially in response to *Mutual Savings,* Treas.Reg. § 1.817–4(d) was amended in 1976. The 1976 amendments provide that when the reinsurer receives a net amount that is less than the increase in its reserves resulting from the transaction, the reinsurer shall be treated as—

"(A) Having received from the reinsured consideration in an amount equal to the net amount of the increase in the reinsurer's reserves resulting from the transaction, and

(B) Having paid the reinsured an amount for the purchase of the contracts equal to the excess of the amount of such increase in the reinsurer's reserves over the net amount received from the reinsured."

*Id.* § 1.817–4(d)(2)(iii). The August 1975 notice of the new proposed rules provided:

"The notice modifies example (1) and adds a new example (3) to make it clear that merely because money passes solely from the seller to the purchaser in a netting transaction, does not mean that the purchaser has paid nothing for the insurance contracts. The notice also contains rules for. determining the purchase price in such transactions."

40 Fed.Reg. 34128 (1975). New Example (1) described a netting transaction[1] in which the reinsurer was required to include as premium income the amount which the ceding company agreed to pay even though a lesser amount was actually transferred by the ceding company pursuant to an agreed to netting arrangement. Example (3), which the government relies on in the instant case, employed the same facts as Example (1) except that the reinsurance agreement did not specifically provide for the netting that occurred.

The government asserts that the 1976 regulation applies to the case at bar and requires recognition of the imputed income. The trial court held that . the 1976 amendments did not address the precise situation we have before us because it was not a netting transaction. The court then held that while the IRS might have changed the regulation it could not change the law and that SBL's position was proper under the law. We agree that the new examples do not treat the precise situation at issue in this case. Nevertheless, it is clear that the IRS intended by the change in the regulation to support the position that the agency takes in the instant litigation. The regulation is not legislative, it is interpretative. While courts often defer to the IRS view expressed in interpretative regulations, particularly long-standing ones, this is not an appropriate case for such deference. *See Rowan Cos. v. United States,* 452 U.S. 247, 101 S.Ct. 2288, 68 L.Ed.2d 814 (1981). Indeed, since the IRS changed the regulation adopted in 1962 in response to its loss in *Mutual Savings,* any deference should go to the 1962 regulation, which stood unchanged for fourteen years.

---

1. A "netting" transaction occurs when the reinsurer in an assumption reinsurance transaction agrees to pay an amount to the ceding company as a commission, or as reimbursement for unrecovered expenses that the ceding company may have incurred in placing the business on the books or as the value of the insurance in force assumed by the reinsurer, and the ceding company agrees to pay the insurer for the assumption of liabilities. "Netting" takes place when one company pays a net amount rather than both parties exchanging payments. One of the cases that precipitated the 1976 regulation amendments, *Kentucky Central Life Insurance Co.,* 57 T.C. 482 (1972), involved a true netting transaction.

The use of a more realistic interest rate would have resulted in a more accurate calculation of SBL's reserves in its assumption reinsurance transaction. A 5¾% interest rate would have produced a reserve close to the approximately $6 million of assets transferred. The 3½% figure actually used was the highest permissible under state law, which allowed SBL to establish the smallest reserve possible on the block of policies acquired. The government's own economist testified that the approximately $1.6 million the IRS wishes to impute as income merely represents the excess of the reserve computed by SBL using the most liberal interest and mortality assumptions allowed under state law over a hypothetical reserve using more realistic (but impermissible) assumptions. The tax code builds in these artificialities by tying deductions to the reserves states require insurance companies to keep. *See United States v. Consumer Life Insurance Co.*, 430 U.S. 725, 749–50, 97 S.Ct. 1440, 1453–54, 52 L.Ed.2d 4 (1977); I.R.C. § 801; Treas.Reg. § 1.801–5.

Section 809(c) requires that SBL include in income only "consideration" it received for assuming liabilities under contracts issued by the Society. The fallacy in the government's argument is its assumption that SBL received more than the approximately $6 million that the Society paid. The only things that SBL received were assets worth about $6 million in return for the assumption of liability on policies of insurance. The government itself relies strongly on the presumption that when parties negotiate at arm's length they consider the items exchanged to be of equal value. *United States v. Davis*, 370 U.S. 65, 72, 82 S.Ct. 1190, 1194, 8 L.Ed.2d 335 (1962). Applying this presumption to the case at bar, SBL's estimate of the liabilities it assumed in the purchase would seem to be equal to the approximately $6 million of assets paid to it to take over the liabilities on the policies. To be sure, SBL set up a reserve of about $7.6 million. But that is an artificial figure, based on an unrealistic 3½% interest rate.

The government argues that we must impute fictional income to SBL to avoid a distortion which would permit SBL to con-trol its own income recognition through the use of arbitrary assumptions underlying the reserve calculations. The argument fails to consider that SBL's reserve calculations are constrained by state law and that the federal law authorizes the use of state reserve calculations. Some distortion may occur in the sense that SBL may claim deductions in years different from those dictated by economic theory, but this is nothing unique or new in the law. The tax law contains numerous artificial accounting rules that may distort "real" income. *See, e.g.,* I.R.C. § 167(k) (sixty-month depreciation for rehabilitation of low income rental housing), § 168 (fifteen-year depreciation under accelerated cost recovery system), § 169 (sixty-month amortization of pollution control facilities). Moreover, such accounting rules do not result in the evasion or avoidance of taxes over a period of years. In the future when SBL pays policy proceeds on the death of an insured, it must reduce the reserves set aside as representing that liability and report the entire decrease as income for tax purposes. As noted in *Mutual Savings,*

> "The crux of this law goes not to whether the sums are to be taxed, but when they will be taxed. Eventually the government will receive tax on every dollar of income which the transaction generates. The law having provided for postponement of the tax on the amount placed in reserves, the IRS by administrative action is not now entitled to nullify that benefit."

488 F.2d at 1147.

The government does not deny that § 809(d)(2) allows a deduction in full for the amount of reserves established under state law and that SBL's establishment of a reserve in conjunction with the assumption reinsurance transaction was in accordance with state law. We hold that § 809(c)(1)(E) requires the reinsurer to report as income only the fair market value of the cash, real estate, and securities that it actually received. The government's position that we must impute an additional amount of income equal to the difference between the assets transferred and the reserves placed in the reinsurer's books for

liabilities assumed does not comport with the congressional intent expressed in the Code.

## II

The second issue in this case involves a disagreement between SBL and the Internal Revenue Service concerning the proper income tax treatment of unpaid deferred and uncollected premiums.[2] To understand the dispute, some background information may be helpful.

The gross premium that a policyholder pays annually consists of a "net valuation premium" and "loading." The "net valuation premium" is the amount of money paid annually that will suffice, given certain mortality and interest rate assumptions, to pay the benefits promised under the policy. Thus, the net valuation premium is the amount added each year to reserves to meet future claims. "Loading" is simply the difference between the gross premium and the net valuation premium, much of which goes for expenses such as general overhead, commissions, and state taxes.

The insurance industry uses two basic methods to compute the net valuation premium: the net level premium and the pre-liminary term. The net level premium method produces a net valuation premium that remains constant over the life of the policy. However, because expenses incurred in the first year of the policy are ordinarily far greater than expenses in subsequent years, the net level premium method of computing reserves distorts the company's financial statements. To enhance the picture of their financial condition in their National Association of Insurance Commissioners (NAIC) Annual Statement, life insurance companies may compute their net valuation premiums under the preliminary term method. Under this method, the net valuation portion of the annual premium is lower in the first year, but higher during the remaining years of the policy. While it may be advantageous for a company to enhance its NAIC financial statement by using the preliminary term method, it is generally to the company's tax advantage to compute the net valuation premium on a net level premium basis to create a greater reserve deduction for the first year of business.

For purposes of its NAIC Annual Statement, SBL used the preliminary term method to compute its net valuation premiums and thus its reserves. However, pursuant to I.R.C. § 818(c),[3] which permits a compa-

---

**2.** Life insurance premiums are often payable in installments. If an installment is not paid when due the policy will lapse, but generally only after a grace period. However, no legally enforceable duty exists to pay the premiums. An installment falling due between the end of a tax year and the policy's anniversary date is a "deferred premium." An installment which is overdue at the end of the tax year is called an "uncollected premium" if the policy has not yet lapsed.

**3.** Section 818(c) provides:

"LIFE INSURANCE RESERVES COMPUTED ON PRELIMINARY TERM BASIS.—For purposes of this part (other than section 801), at the election of the taxpayer the amount taken into account as life insurance reserves with respect to contracts for which such reserves are computed on a preliminary term basis may be determined on either of the following bases:

(1) EXACT REVALUATION.—As if the reserves for all such contracts had been computed on a net level premium basis (using the same mortality assumptions and interest rates for both the preliminary term basis and the net level premium basis).

(2) APPROXIMATE REVALUATION.— The amount computed without regard to this subsection—

(A) increased by $19 per $1,000 of insurance in force (other than term insurance) under such contracts, less 1.9 percent of reserves under such contracts, and

(B) increased by $5 per $1,000 of term insurance in force under such contracts which at the time of issuance cover a period of more than 15 years, less 0.5 percent of reserves under such contracts.

If the taxpayer makes an election under either paragraph (1) or (2) for any taxable year, the basis adopted shall be adhered to in making the computations under this part (other than section 801) for the taxable year and all subsequent taxable years unless a change in the basis of computing such reserves is approved by the Secretary, except that if, pursuant to an election made for a taxable year beginning in 1958 or in effect for a taxable year beginning in 1981, the basis adopted is the basis provided in paragraph (2), the taxpayer may adopt the basis provided by paragraph (1) for its first taxable year beginning after 1958 or 1981, whichever is applicable."

ny that uses the preliminary term method for annual statement purposes to use a net level premium basis or an approximate revaluation basis for tax purposes, SBL recomputed its reserves using the approximate revaluation method to increase the amount of its reserve deduction under I.R.C. § 809(d)(2).

The treasury regulations interpreting § 809 previously required that the insurance company's premium income reported under § 809(c)(1) include the gross amount of all annual premiums, including deferred and uncollected premiums. SBL followed these provisions for its tax years 1958–1970. However, in *Commissioner v. Standard Life & Accident Ins. Co.,* 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977), the Supreme Court held that only the net valuation portion of deferred and uncollected premiums need be included in premium income under § 809(c)(1).

In response to the *Standard Life* decision, the Internal Revenue Service issued Rev. Proc. 78–6, 1978–1 C.B. 558, allowing companies that had previously adhered to the treasury regulations to change retroactively their method of accounting for deferred and uncollected premiums. Since SBL had included the loading portion of unpaid premiums in its gross premium income for all years between 1958 and 1970, both parties agree that SBL overpaid its taxes for this period and is entitled to an adjustment. The parties disagree, however, concerning the amount of the adjustment. The district court held that the taxpayer did not have to use the same method to compute net valuation deferred and uncollected premiums to be included in income as the taxpayer used to compute such premiums for reserve purposes, which meant that SBL did not have to recompute loading pursuant to its § 818(c)(2) election. On appeal, the government argues that the taxpayer must compute the net valuation portion of the deferred and uncollected premiums under the same method for determining the amount includable in income under § 809(c)(1) of the Code as it uses for determining the reserve deduction under § 809(d)(2).

To understand the positions of the parties, a brief discussion of the *Standard Life*

decision is in order. In that case the IRS contended that the gross amount of deferred and uncollected premiums should be includable in income under § 809(c)(1), thereby increasing the company's gain from operations not only by the amount of the net valuation portion of unpaid premiums, but also by the loading portion. In contrast, the taxpayer contended that the net valuation portion of deferred and uncollected premiums should be added to deductible reserves but that no amount should be taken into income. The Supreme Court adopted a compromise position, stating that the net valuation portion of deferred and uncollected premiums (but not the loading) should be included in income under § 809(c)(1) as well as deducted from income as an addition to reserves under § 809(d)(2).

The government concedes that the issue we face here was not before the Court in *Standard Life,* but it nevertheless contends that *Standard Life* established a required symmetry between amounts includable in income under § 809(c)(1) and deductible reserves under § 809(d)(2). Thus, it argues that SBL may not use the preliminary term method that it employed in its NAIC Annual Statement for income reporting but use the approximate revaluation method for its deductible reserves. We do not agree.

The Court in *Standard Life* considered whether annual statement loading could be divided into two parts so that a deduction could be limited to the portion attributable to commissions and similar expenses. The Court rejected this approach because the Code does not include a specific provision for a recomputation of loading for deduction purposes. It stated, "Since there is nothing in the statute directing that any portion of unpaid loading be treated as an asset or as income, the statute obviously cannot provide guidance in fashioning a set of deductions to be credited against the fictional assumption that such loading is income." 433 U.S. at 161, 97 S.Ct. at 2530. Further, the Court stated that its holding "avoids the uncertainty and confusion that would attend any attempt to segregate unpaid loading into deductible and nondeductible parts," and "provides a practical rule

which should minimize the likelihood of future disputes." *Id.* at 162, 97 S.Ct. at 2531.

The government now asks this Court to do what the Supreme Court deemed inappropriate. Not only is there nothing in the statute directing that any portion of unpaid loading be treated as an asset or as income, but there is no reference whatsoever in the Code to loading or net valuation premiums, which are really only NAIC Annual Statement and actuarial concepts. The government's actuarial expert, Werner Marwitz, testified that there are "many different ways" to approximate the government's urged adjustment to loading, but he acknowledged that neither the Code nor IRS pronouncements provide any guidance. Marwitz concluded that "any reasonable estimate should be accepted." Further, the court below found as a fact that "[t]he factors that determine the amount of the increase in reserves are not the same as the factors that determine the amount of loading on unpaid premiums." 517 F.Supp. at 770.

Perfect symmetry in tax laws is not required. 433 U.S. at 148, 97 S.Ct. at 2524. The government's argument ignores the express provisions of § 818(c) that the election only affects the computation of the amount taken into account as reserves. The introductory clause to § 818(c) states that "[f]or purposes of *this* part" the taxpayer may elect to revalue "the amount taken into account as life insurance reserves." (Emphasis added). Further, § 818(c)(1) provides that the amount to be taken into account as reserves with respect to contracts for which such reserves are computed on a preliminary term basis may be determined "[a]s if the reserves for all such contracts had been computed on a net level premium basis." Thus, § 818(c) does not require that the taxpayer adopt the net level premium method, much less adopt it for all purposes. Solely for the purpose of computing the amount taken into account as reserves § 818(c) treats the taxpayer "as if" it used the net level premium method, thereby recognizing that for other purposes the taxpayer may not have used this method.

The government suggests that the last sentence of § 818(c) indicates that election of the net valuation method requires that loading be recomputed. That sentence states that if an election is made "the basis adopted shall be adhered to in making the computations under this part (other than section 801) for the taxable year and all subsequent taxable years." We construe this sentence to require only that the method used in calculating the addition to the reserve (i.e., the exact method under § 818(c)(1) or the approximate method under § 818(c)(2)) must be used in each of "the computations under this part (other than section 801)," so that the reserve amounts taken into account will be the same for all purposes except for qualification as a life insurance company under the reserve ratio test of § 801. The "basis adopted" language in the last sentence does not refer to an actuarial basis for computing reserves because the method under § 818(c)(2) merely involves the addition of dollar amounts to preliminary term reserves. No language in § 818(c) states or implies that a life insurance company accepting the benefit of recomputing reserves must also recompute for tax purposes the net valuation premium portion and the loading portion of the company's unpaid premiums shown on its Annual Statement. Moreover, SBL's Annual Statement, including the allocation of deferred and uncollected premiums, is derived from an accounting system approved by the NAIC. The system has a statutory basis, and as the Supreme Court noted in *Standard Life,* it provides guidance for courts considering problems that relate to the income taxation of insurance companies. 433 U.S. at 151, 97 S.Ct. at 2525.

▮ The government argues that Congress would undoubtedly require a taxpayer to use the same method for computing the net valuation premium for reserve purposes as for other purposes under Part I of subchapter L because of its aim to eliminate the tax advantage enjoyed by life insurance companies carrying net level premium reserves on their Annual Statements over companies carrying preliminary reserves. Thus, the government's argument goes, if the electing "preliminary term taxpayer"

were allowed to use the net level method to compute its net valuation premium for deduction purposes but the preliminary term method to compute its net valuation premium for income purposes, the preliminary term taxpayer would achieve superiority over rather than parity with net level premium taxpayers. The government bases its argument on the erroneous premise that SBL's § 818(c)(2) election constitutes the use of a net level premium reserve method. The net level premium method of computing reserves depends on actuarial principles based on mortality and interest rate assumptions. In contrast, as the district court noted, reserve computations under § 818(c)(2) depend on the face amount, the type, and the duration of the insurance determined at the time of issuance. 517 F.Supp. at 770. Indeed, § 818(c)(2) merely involves the simple addition of specific dollar amounts that will be treated as reserves in addition to the underlying reserves computed on a preliminary term basis. The government's own expert, Marwitz, recognized that the method of increasing amounts to be treated as reserves under § 818(c)(2) is not the net level premium method of reserving; it is not a reserving method at all. He said that whether recomputed reserves approximate net level premium reserves "depends on the mix of the business of the company." The record does not contain specific evidence concerning the dimensions of the tax advantage to which the government refers. As Marwitz testified, an election under § 818(c) could result in a tax disadvantage to a company "with little new business and a lot of renewal business all on preliminary term reserves." Accordingly, we hold that a taxpayer need not employ the same method to compute the net valuation portion of deferred and uncollected premiums to be included in income under 26 U.S.C. § 809(c)(1) as it used to compute the net valuation portion of such premiums added to reserves pursuant to an election under § 818(c)(2). *Accord Reserve Life Insurance Co. v. United States,* 640 F.2d 368 (Ct.Cl. 1981); *Beneficial Life Insurance Co.,* 79 T.C. 627 (1982).

AFFIRMED.